LOUISE ETHERIDGE, ET AL., ETC.

V.

MEDICAL CENTER HOSPITALS, ET AL.

Record No. 860194

January 13, 1989

Present: Carrico, C.J., Poff,* Compton, Stephenson, Russell, Thomas, and Whiting, JJ.

* Justice Poff participated in the hearing and decision of this case prior to the effective date of his retirement on December 31, 1988.

*Donald I. Marlin (Alan J. Konigsberg; Stephen C. Swain; Frederick T. Stant, Jr.; Levy, Phillips & Konigsberg; Clark & Stant, P.C.*, on briefs), for appellants.

*Stanley G. Barr, Jr.; Thomas J. Harlan, Jr. (David J. Pierce; William M. Sexton; Michael F. Bergan; Philip N. Kabler; Kaufman & Canoles, P.C.; Harlan, Knight, Dudley & Pincus*, on briefs), for appellees.

*Amici Curiae:* Commonwealth of Virginia (Mary Sue Terry, Attorney General; Gail Starling Marshall, Deputy Attorney General; James T. Moore, III, Senior Assistant Attorney General; William L. Thurston, Assistant Attorney General; Gregory E. Lucyk, Assistant Attorney General, on brief), for appellees.

Medical Society of Virginia (Allen C. Goolsby, III; Patricia M. Schwarzschild; W. Jeffrey Edwards; Robert Acosta-Lewis; Hunton & Williams, on brief), for appellees.

STEPHENSON, J., delivered the opinion of the Court.

The principal issue in this appeal is whether Code § 8.01-581.15, which limits the amount of recoverable damages in a medical malpractice action, violates either the Federal or Virginia Constitution. Two other issues involve the interpretation of statutes.

## I

Louise Etheridge and Larry Dodd, co-committees of the estate of Richie Lee Wilson (Wilson), sued Medical Center Hospitals (the hospital) and Donald Bedell Gordon, executor of the estate of Clarence B. Trower, Jr., deceased (Trower), alleging that the hospital and Trower were liable, jointly and severally, for damages Wilson sustained as a result of their medical malpractice. Evidence at trial revealed that, prior to her injuries, Wilson, a 35-year-old mother of three children, was a normal, healthy woman. On May 6, 1980, however, Wilson underwent surgery at the hospital to restore a deteriorating jaw bone. The surgery consisted of

the removal of five-inch-long portions of two ribs by Trower, a general surgeon, and the grafting of the reshaped rib bone to Wilson's jaw by an oral surgeon. The jury found that both Trower and the hospital were negligent and that their negligence proximately caused Wilson's injuries.

Wilson's injuries are severe and permanent. She is brain damaged with limited memory and intelligence. She is paralyzed on her left side, confined to a wheelchair, and unable to care for herself or her children.

At the time of trial, Wilson had expended more than $300,000 for care and treatment. She will incur expenses for her care the remainder of her life. Her life expectancy is 39.9 years. Wilson, a licensed practical nurse, earned almost $10,000 in 1979, the last full year she worked. She contends that she proved an economic loss "in excess of $1.9 million."

The jury returned a verdict for $2,750,000 against both defendants. The trial court, applying the recovery limit prescribed in Code § 8.01-581.15 (1977 Repl. Vol.), reduced the verdict to $750,000 and entered judgment in that amount. Wilson appeals.

At all times pertinent to this case, Code § 8.01-581.15 provided that in an action for malpractice against a health care provider, "the total amount recoverable for any injury . . . shall not exceed seven hundred fifty thousand dollars."[1] Wilson challenges the validity of this legislation on multiple grounds. She contends that Code § 8.01-581.15 violates the Virginia Constitution's due process guarantee, jury trial guarantee, separation of powers doctrine, prohibitions against special legislation, and equal protection guarantee, as well as certain parallel provisions of the Federal Constitution.

## II

On February 6, 1975, the General Assembly adopted House Joint Resolution No. 174, authorizing a study and report on malpractice insurance premiums for physicians. H. R. Res. 174, Va. Gen. Assem. (1975). The study was conducted by the State Corporation Commission's Bureau of Insurance.

---

[1] In 1983, the General Assembly amended Code § 8.01-581.15 by increasing the recovery limitation to "one million dollars," when the act or acts of malpractice occurred "on or after October 1, 1983." Acts 1983, c. 496.

Upon completion of its study in November 1975, the Bureau of Insurance submitted its report to the General Assembly. The report showed that since 1960 medical malpractice insurance rates had increased nationwide more than 1000 percent. The increase resulted from the number and severity of medical malpractice claims. Significantly, the report stated that 90 percent of all medical malpractice claims ever pursued originated after 1965. Bureau of Insurance, State Corporation Commission, *Medical Malpractice Insurance in Virginia, the Scope and Severity of the Problem and Alternative Solutions.* The information in the report was incorporated into Senate Document No. 29, entitled *Interim Report of the Commission to Study the Costs and Administration of Health Care Services to the Governor and the General Assembly of Virginia.*

Based upon its study, the General Assembly found that the increase in medical malpractice claims was directly affecting the premium cost for, and the availability of, medical malpractice insurance. Without such insurance, health care providers could not be expected to continue providing medical care for the Commonwealth's citizens. Because of this threat to medical care services, the General Assembly, in 1976, enacted the Virginia Medical Malpractice Act (the Act). Acts 1976, c. 611.

The need and reasons for the legislation are stated in the Preamble to the Act:

Whereas, the General Assembly has determined that it is becoming increasingly difficult for health care providers of the Commonwealth to obtain medical malpractice insurance with limits at affordable rates in excess of $750,000; and

Whereas, the difficulty, cost and potential unavailability of such insurance has caused health care providers to cease providing services or to retire prematurely and has become a substantial impairment to health care providers entering into practice in the Commonwealth and reduces or will tend to reduce the number of young people interested in or willing to enter health care careers; and

Whereas, these factors constitute a significant problem adversely affecting the public health, safety and welfare which necessitates the imposition of a limitation on the liability of health care providers in tort actions commonly referred to as medical malpractice cases[.]

■ The General Assembly concluded, therefore, that escalating costs of medical malpractice insurance and the availability of such insurance were substantial problems adversely affecting the health, safety, and welfare of Virginia's citizens. *Id.* Thus, the General Assembly made a judgment that passage of the Act, including Code § 8.01-581.15, was an appropriate means of addressing the problem. Code § 8.01-581.15 (originally Code § 8-654.8), as originally enacted and in effect at all times pertinent to the present case, provided as follows:

> In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after April one, nineteen hundred seventy-seven, which is tried by a jury or in any judgment entered against a health care provider in such an action which is tried without a jury, the total amount recoverable for any injury to, or death of, a patient shall not exceed seven hundred fifty thousand dollars.

## III

### A

■ It is firmly established that all actions of the General Assembly are presumed to be constitutional. *Riddleberger* v. *Chesapeake Railway*, 229 Va. 213, 215, 327 S.E.2d 663, 664 (1985); *Waterman's Assoc.* v. *Seafood, Inc.*, 227 Va. 101, 110, 314 S.E.2d 159, 164 (1984); *Blue Cross* v. *Commonwealth*, 221 Va. 349, 358, 269 S.E.2d 827, 832 (1980); *Peery* v. *Board of Funeral Directors*, 203 Va. 161, 165, 123 S.E.2d 94, 97 (1961); *Dean* v. *Paolicelli*, 194 Va. 219, 227, 72 S.E.2d 506, 511 (1952); *Ex Parte Settle*, 114 Va. 715, 719, 77 S.E. 496, 497 (1913). Therefore, the party assailing the legislation has the burden of proving that it is unconstitutional, *Riddleberger*, 229 Va. at 215, 327 S.E.2d at 664, and if a reasonable doubt exists as to a statute's constitutionality, the doubt must be resolved in favor of its validity, *Blue Cross*, 221 Va. at 358, 269 S.E.2d at 832. Indeed, because "[a] judgment as to the wisdom and propriety of a statute is within the legislative prerogative," *id.*, courts will declare legislation invalid only when it is "plainly repugnant to some provision of the state or federal constitution," *id.* Thus, Wilson's multiple claims of unconstitu-

tionality must be examined in the light of these long-standing principles.

## B

One of Wilson's primary contentions is that Code § 8.01-581.15 violates her right under the Virginia Constitution to a trial by jury. She asserts that "legislation may not override the findings of a jury by prescribing an absolute limit upon the amount of damages, irrespective of the facts and the jury verdict."

Article I, § 11, of the Constitution of Virginia provides, *inter alia*, "[t]hat in controversies respecting property, and in suits between man and man, trial by jury is preferable to any other, and ought to be held sacred." It is "well settled that . . . the State . . . Constitution [neither] guarantees [nor] preserves the right of trial by jury except in those cases where it existed when" the Constitution was adopted. *Bowman* v. *Va. State Entomologist*, 128 Va. 351, 372, 105 S.E. 141, 148 (1920). *Accord Pillow* v. *Southwest Va. Imp. Co.*, 92 Va. 144, 149, 23 S.E. 32, 33 (1895). *See also* 1 A. Howard, *Commentaries on the Constitution of Virginia*, at 246-48 (1974). Therefore, in determining whether the cap prescribed in Code § 8.01-581.15 violates the jury trial guarantee, "[w]e must look to the law as it existed when the Constitution was adopted and as it has been uniformly construed since that time." *Forbes & Co.* v. *So. Cotton Oil Co.*, 130 Va. 245, 260, 108 S.E. 15, 20 (1921).

When the Virginia Constitution first was adopted in 1776, a jury's role was defined by three procedures: the "case stated," the "demurrer to the evidence," and the "special verdict." Henderson, *The Background of the Seventh Amendment*, 80 Harv. L. Rev. 289, 319 (1966) (*Henderson*). The "case stated" procedure best portrays the time-honored distinction between the roles of a court and a jury in a judicial proceeding.

The "case stated" was a trial device employed to bypass the jury when only undisputed facts remained in a case. When this occurred, the jury's role was reduced to a mere formality. *Henderson* at 305. During a trial that resulted in a "case stated," the jury remained to resolve factual issues that arose, but the jury was not empowered to give specific legal effect to its decisions. *Id.* at 305-06. The "case stated" procedure, therefore, demonstrates that, at the time the Constitution was adopted, the jury's sole function was to resolve disputed facts.

■ The resolution of disputed facts continues to be a jury's sole function. "The province of the jury is to settle questions of fact, and when the facts are ascertained the law determines the rights of the parties." *Forbes*, 130 Va. at 260, 108 S.E. at 20. Thus, the Virginia Constitution guarantees only that a jury will resolve disputed facts. *Id.*

■ Without question, the jury's fact-finding function extends to the assessment of damages. *Stanardsville Vol. Fire Co. v. Berry*, 229 Va. 578, 583, 331 S.E.2d 466, 469-70 (1985); *O'Brien v. Snow*, 215 Va. 403, 405, 210 S.E.2d 165, 167 (1974). Once the jury has ascertained the facts and assessed the damages, however, the constitutional mandate is satisfied. *Forbes*, 130 Va. at 260-61, 108 S.E. at 20. Thereafter, it is the duty of the court to apply the law to the facts. *Id.* at 265-67, 108 S.E. at 22.

■ The limitation on medical malpractice recoveries contained in Code § 8.01-581.15 does nothing more than establish the outer limits of a remedy provided by the General Assembly. A remedy is a matter of law, not a matter of fact. *See Phipps, Adm'r v. Sutherland*, 201 Va. 448, 452, 111 S.E.2d 422, 425 (1959); *Duffy v. Hartsock*, 187 Va. 406, 416, 46 S.E.2d 570, 574 (1948). A trial court applies the remedy's limitation only *after* the jury has fulfilled its fact-finding function. Thus, Code § 8.01-581.15 does not infringe upon the right to a jury trial because the section does not apply until after a jury has completed its assigned function in the judicial process.

■ More importantly, as previously stated, the jury trial guarantee secures no rights other than those that existed at common law. Significantly, the common law never recognized a right to a full recovery in tort. *See Phipps*, 201 Va. at 452, 111 S.E.2d at 425; *see also Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 88-89 n.32 (1978) (compiling cases). Thus, although a party has the right to have a jury assess his damages, he has no right to have a jury dictate through an award the legal consequences of its assessment. For this reason, too, the limited recovery set forth in Code § 8.01-581.15 effects no impingement upon the right to a jury trial.

■ In the present case, the jury resolved the disputed facts and assessed the damages. Wilson, therefore, was accorded a jury trial as guaranteed by the Virginia Constitution. Once the jury had determined the facts, the trial court applied the law and reduced the verdict in compliance with the cap prescribed by the

General Assembly in Code § 8.01-581.15. By merely applying the law to the facts, the court fulfilled its obligation. Accordingly, the remedy prescribed by the General Assembly did not infringe upon Wilson's right to a jury.

## C

Wilson also contends that Code § 8.01-581.15 violates the constitutional guarantee of due process. The due process clauses of the Federal and Virginia Constitutions provide that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1; Va. Const. art. I, § 11. Both procedural and substantive rights are protected by the due process clauses.

Procedural due process guarantees a litigant the right to reasonable notice and a meaningful opportunity to be heard. *Parratt* v. *Taylor*, 451 U.S. 527, 540 (1981); *Com'sion* v. *Hampton Rds. Oyster Co.*, 109 Va. 565, 585, 64 S.E. 1041, 1048 (1909); *Ward Co.* v. *Henderson White Co.*, 107 Va. 626, 630, 59 S.E. 476, 478 (1907). The procedural due process guarantee does not create constitutionally-protected interests; the purpose of the guarantee is to provide procedural safeguards against a government's arbitrary deprivation of certain interests. *Leis* v. *Flynt*, 439 U.S. 438, 441 (1979). *See also Smith* v. *Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 840-41 (1977).

By comparison, substantive due process tests the reasonableness of a statute vis-a-vis the legislature's power to enact the law. Ordinarily, substantive due process is satisfied if the legislation has a "reasonable relation to a proper purpose and [is] neither arbitrary nor discriminatory." *Duke* v. *County of Pulaski*, 219 Va. 428, 437-38, 247 S.E.2d 824, 829 (1978). *See also Board of Supervisors* v. *State Milk Comm.*, 191 Va. 1, 8-9, 60 S.E.2d 35, 39, *appeal dismissed*, 340 U.S. 881 (1950); *Finney* v. *Hawkins*, 189 Va. 878, 886, 54 S.E.2d 872, 876 (1949); *Stickley* v. *Givens*, 176 Va. 548, 560, 11 S.E.2d 631, 637 (1940). If legislation withstands this so-called "rational basis" test, due process is not violated.

When, on the other hand, legislation affects a "fundamental right," the constitutionality of the enactment will be judged according to the "strict scrutiny" test, *i.e.*, the law must be necessary to promote a compelling or overriding governmental interest. *San Antonio Independent School District* v. *Rodriguez*, 411 U.S.

1, 18 (1973). Those interests that have been recognized as "fundamental" include the right to free speech, *NAACP* v. *Alabama ex rel. Patterson*, 357 U.S. 449 (1958); the right to vote, *Harper* v. *Virginia Bd. of Elections*, 383 U.S. 663 (1966); the right to interstate travel, *Shapiro* v. *Thompson*, 394 U.S. 618 (1969); the right to fairness in the criminal process, *Mayer* v. *Chicago*, 404 U.S. 189 (1971); the right to marry, *Zablocki* v. *Redhail*, 434 U.S. 374 (1978); and the right to fairness in procedures concerning governmental deprivation of life, liberty, or property, *Goldberg* v. *Kelly*, 397 U.S. 254 (1970).

▉ Occasionally employed in connection with claims of due process violations is the "irrebuttable presumption" line of analysis. Generally, if a government presumes facts that leave no room for rebuttal and uses that presumption to deny a person a constitutional right, due process will be violated. *See Cleveland Board of Education* v. *LaFleur*, 414 U.S. 632 (1974). If the right or status affected by the irrebuttable presumption is constitutionally protected, the presumed facts must be "necessarily or universally true." *Vlandis* v. *Kline*, 412 U.S. 441, 452 (1973). Conversely, if the right or classification enjoys no constitutionally-protected status, the presumption will be upheld if it is rationally related to a legitimate legislative goal. *Weinberger* v. *Salfi*, 422 U.S. 749, 771-72 (1975).

In this appeal, Wilson bases her claim of a due process violation solely upon the irrebuttable presumption rationale. She contends that she has been "deprived of an effective opportunity to be heard, since [Code § 8.01-581.15] purports to preordain the result of the hearing." Thus, she asserts, the statute "creates a conclusive presumption that no plaintiff's damages exceed $750,000." Wilson relies upon *LaFleur*, 414 U.S. 632, to support her claim.[2]

In *LaFleur*, a Board of Education had established rules that required pregnant teachers to take a leave of absence at the end of the fourth or fifth month of pregnancy and prohibited their return to work until three months after childbirth, irrespective of whether the teacher was actually able to perform her job. The Supreme Court stated that the mandatory leave rules "directly affect 'one of the basic civil rights of man,' " *id.* at 640, (quoting

---

[2] Wilson also relies upon *Assaid* v. *Roanoke*, 179 Va. 47, 18 S.E.2d 287 (1942). *Assaid* is inapposite. There, unlike the present case, the aggrieved party was denied procedural due process because the challenged ordinance completely failed to provide for notice and an opportunity to be heard.

*Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942)), *i.e.*, the right to bear or beget children, *id*. Therefore, the Court stated, "the Fourteenth Amendment requires that such rules must not needlessly, arbitrarily, or capriciously impinge upon this vital area of a teacher's constitutional liberty." *Id*. The Supreme Court concluded that the mandatory leave regulations violated the Fourteenth Amendment because they "employ[ed] irrebuttable presumptions that unduly penalize a female teacher for deciding to bear a child." *Id*. at 648.

▇ In reaching its conclusion, the Court said "the provisions amount to a conclusive presumption that every pregnant teacher who reaches the fifth or sixth month of pregnancy is physically incapable of continuing" at her job. *Id*. at 644. The Court noted that "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause." *Id*. at 639. The Court held that the Constitution requires a more individualized approach to determining whether a teacher is physically capable of continuing her employment during pregnancy and resuming her duties after childbirth. *Id*. at 645.

▇ In the present case, Wilson has not been denied reasonable notice and a meaningful opportunity to be heard. Code § 8.01-581.15 has no effect upon Wilson's right to have a jury or court render an individual decision based upon the merits of her case. Thus, unlike the administratively-mandated maternity leave rule deemed invalid in *LaFleur*, Code § 8.01-581.15 creates no presumptions whatsoever regarding the individual merits of Wilson's medical malpractice claim. The section merely affects the parameters of the remedy available to Wilson after the merits of her claim have been decided. We hold, therefore, that Wilson's constitutional guarantee of procedural due process has not been violated.[3]

▇ The effect of Code § 8.01-581.15 on the remedy available to Wilson likewise is not violative of any substantive due process right. As discussed under Section III B, *supra*, a party has no fundamental right to a particular remedy or a full recovery in tort. A statutory limitation on recovery is simply an economic regulation, which is entitled to wide judicial deference. *Duke Power Co.*, 438 U.S. at 83. Because Code § 8.01-581.15 is such a regula-

---

[3] Although Wilson casts her irrebuttable presumption argument in terms of procedural due process, our reading of *LaFleur* suggests that the case involved a substantive due process claim.

tion and infringes upon no fundamental right, the section must be upheld if it is reasonably related to a legitimate governmental purpose.

In Part II of this opinion, we set forth the General Assembly's findings for limiting the amount of recoveries in medical malpractice cases. The purpose of Code § 8.01-581.15 — to maintain adequate health care services in this Commonwealth — bears a reasonable relation to the legislative cap — ensuring that health care providers can obtain affordable medical malpractice insurance. We hold, therefore, that substantive due process has not been violated.

## D

Wilson further contends that Code § 8.01-581.15 violates the doctrine of separation of powers set forth in Article III, § 1 of the Virginia Constitution. That constitutional provision states, *inter alia*, that "[t]he legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others." Wilson not only claims that Code § 8.01-581.15 is facially unconstitutional, but also asserts that it "interferes with the power of the court to enter and enforce its own judgments" and "seeks to circumscribe the discretion and power of judicial officers," converting them into "ministerial agents of the legislative department."

The powers of the Commonwealth's courts are set forth in Article VI, § 1 of the Constitution. That section provides, *inter alia*, that subject to the provisions relating to the powers and jurisdiction of this Court, "the General Assembly shall have the power to determine the original and appellate jurisdiction of the courts of the Commonwealth." The legislative powers conferred upon the General Assembly are set forth in Article IV, § 14 of the Constitution, which states that the General Assembly's authority "shall extend to all subjects of legislation not herein forbidden or restricted."

One area in which the General Assembly's authority has not been forbidden or restricted is the common law. "The common and statute law in force at the time this revised Constitution goes into effect, so far as not in conflict therewith, *shall remain in force until they* expire by their own limitation or *are altered or repealed by the General Assembly*. Va. Const., art. XII, § 3 (emphasis added). Indeed, "[t]here is nothing in the common law that

is not subject to repeal by the Legislature unless it has been reenacted in some constitutional provision." *Howell* v. *Commonwealth*, 187 Va. 34, 41, 46 S.E.2d 37, 40 (1948). More to the point, the legislature has the power to provide, modify, or repeal a remedy. *Phipps*, 201 Va. at 452, 111 S.E.2d at 425. *Accord Duke Power Co.*, 438 U.S. at 88-89 n.32.

> Virginia alone can prescribe the jurisdiction of her own courts. She can mould her remedies as she pleases . . . . She may be bound to provide some remedy for wrong, but she is the exclusive and sovereign judge of the form of the remedy.

*The Richmond, &c. Railroad Co.* v. *The Louisa Railroad Co.*, 54 U.S. 71, 77 (1852). ▉ Thus, whether the remedy prescribed in Code § 8.01-581.15 is viewed as a modification of the common law or as establishing the jurisdiction of the courts in specific cases, clearly it was a proper exercise of legislative power. Indeed, were a court to ignore the legislatively-determined remedy and enter an award in excess of the permitted amount, the court would invade the province of the legislature. Accordingly, we hold that Code § 8.01-581.15 does not violate the separation of powers doctrine.

### E

▉ Wilson also contends that Code § 8.01-581.15 violates two constitutional provisions prohibiting special legislation. One of these provisions, contained in Article I, § 4, of the Virginia Constitution, states that "no man, or set of men, is entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services; which not being descendible, neither ought the offices of magistrate, legislator, or judge to be hereditary." We have held that "this clause was intended to shield against heredity in office and has no reference to the . . . action of the legislature in passing laws regulating the domestic policy and business affairs of the people, or any portion of them." *O'Neil* v. *City of Richmond*, 141 Va. 168, 178, 126 S.E. 56, 59 (1925). Thus, Article I, § 4, does not apply to the present case.

Wilson also claims that Code § 8.01-581.15 violates Article IV, § 14, which provides, in pertinent part, that "[t]he General Assembly shall not enact any local, special, or private law . . . . [g]ranting to any private corporation, association, or individual

any special or exclusive right, privilege, or immunity." Wilson argues that Code § 8.01-581.15 "purports to confer special privileges and immunities upon a small segment of the population—physicians and their insurers—while at the same time arbitrarily distinguishing between severely injured victims of medical malpractice and less severely injured malpractice claimants as well as all other tort plaintiffs." We do not agree.

▇▇▇ Long ago, we held that "[l]aws may be made to apply to a class only, and that class may be in point of fact a small one, provided the classification itself be a reasonable and not an arbitrary one, and the law be made to apply to all of the persons belonging to the class without distinction." *Ex Parte Settle*, 114 Va. at 718-19, 77 S.E. at 497. *Accord Riddleberger*, 229 Va. at 217, 327 S.E.2d at 665. *See also Peery*, 203 Va. at 166, 123 S.E.2d at 97 (statute permitting disabled veterans within prescribed classification to obtain funeral director license without examination did not constitute special legislation).

▇▇▇ Moreover, if the classification bears "a reasonable and substantial relation to the object sought to be accomplished by the legislation," it will survive a special-laws constitutional challenge. *Mandell* v. *Haddon*, 202 Va. 979, 991, 121 S.E.2d 516, 525 (1961). *Accord Benderson Development Co.* v. *Sciortino*, 236 Va. 136, 149, 372 S.E.2d 751, 757 (1988). Indeed, "the necessity for and the reasonableness of classification are primarily questions for the legislature. If any state of facts can be reasonably conceived, that would sustain it, that state of facts at the time the law was enacted must be assumed."[4] *Martin's Ex'rs* v. *Commonwealth*, 126 Va. 603, 612-13, 102 S.E. 77, 80 (1920). Whether a classification is arbitrary "depend[s] upon the purpose and subject of the particular act and the circumstances and conditions surrounding its passage." *Id.* at 610, 102 S.E. at 79. *Accord Avery* v. *Beale*, 195 Va. 690, 701, 80 S.E.2d 584, 591 (1954); *Joyner* v. *Centre Motor Co.*, 192 Va. 627, 632-33, 66 S.E.2d 469, 472 (1951).

After careful and deliberate study, the General Assembly determined that health care providers faced increasing difficulty in obtaining affordable malpractice insurance coverage in excess of $750,000 and that this situation would tend to reduce the number of health care providers available to serve Virginia's citizens. The

---

[4] Despite this well-established principle, the dissent apparently would "second guess" the General Assembly's judgment and have this Court determine the necessity for and reasonableness of the classification.

General Assembly further determined that "these factors constitute a significant problem adversely affecting the public health, safety and welfare" and necessitate the imposition of a limitation on the liability of health care providers in medical malpractice actions. Having made these determinations, the General Assembly decided that the damage award in medical malpractice actions should not exceed $750,000. The limitation applies to *all* health care providers and to *all* medical malpractice plaintiffs.

According the legislation the presumption of validity to which it is entitled, we conclude that the classification is not arbitrary and bears a reasonable and substantial relation to the object sought to be accomplished by the legislation. We further conclude that the legislation applies to all persons belonging to the class without distinction and, therefore, is not special in effect. Accordingly, we hold that Code § 8.01-581.15 does not violate the prohibition against special legislation.

F

In Wilson's final constitutional attack upon Code § 8.01-581.15, she contends that it violates the Equal Protection Clause in the Fourteenth Amendment to the Federal Constitution. That clause provides in pertinent part that no state shall "deny to any person . . . the equal protection of the laws."[5] U.S. Const. amend. XIV, § 1.

To withstand an equal protection challenge, a classification that neither infringes upon a fundamental right[6] nor creates a suspect class[7] must satisfy the "rational basis" test. *Exxon Corp.* v. *Eagerton*, 462 U.S. 176, 195-96 (1983); *Hodel* v. *Indiana*, 452

---

[5] Wilson also claims that Code § 8.01-581.15 violates the anti-discrimination clause in Article I, § 11 of the Virginia Constitution. This clause, however, is wholly inapplicable because it applies only to "governmental discrimination upon the basis of religious conviction, race, color, sex, or national origin." Even if the clause were applicable, "[i]t is no broader than the equal protection clause of the Fourteenth Amendment to the [Federal] Constitution." *Archer and Johnson* v. *Mayes*, 213 Va. 633, 638, 194 S.E.2d 707, 711 (1973).

[6] See Section III C, *supra*, for a discussion of fundamental rights.

[7] Suspect classifications are those based upon race, *Brown* v. *Board of Education*, 347 U.S. 483 (1954), and national origin, *Korematsu* v. *United States*, 323 U.S. 214 (1944). Classifications based upon gender, *see, e.g., Craig* v. *Boren*, 429 U.S. 190 (1976); alienage, *see, e.g., Plyler* v. *Doe*, 457 U.S. 202 (1982); and illegitimacy, *see, e.g., Pickett* v. *Brown*, 462 U.S. 1 (1983), are entitled to receive a level of scrutiny between strict scrutiny and the rational basis test.

U.S. 314, 331-32 (1981); *City of Richmond* v. *Levi*, 226 Va. 625, 628-29, 311 S.E.2d 114, 117 (1984); *Bradford* v. *Nature Conservancy*, 224 Va. 181, 193, 294 S.E.2d 866, 872 (1982). Wilson acknowledges that this is the proper test to be applied in the present case.

The rational basis test is satisfied "if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose." *Eagerton*, 462 U.S. at 196. Consequently, a classification will not be ruled unconstitutional merely because it causes some inequality or some discrimination. *Dandridge* v. *Williams*, 397 U.S. 471, 485 (1970); *Sheek* v. *City of Newport News*, 214 Va. 288, 291, 199 S.E.2d 519, 522 (1973). As Chief Justice Warren so aptly stated:

> [T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. . . . State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*McGowan* v. *Maryland*, 366 U.S. 420, 425-26 (1961).

Wilson seeks to "second guess" the General Assembly by claiming that its factual findings do not constitute a reasonable basis for limiting recoverable damages in a medical malpractice action. Wilson also claims that "[e]ven if there were some factual premise for the legislation," it must fail because there is no relationship between the General Assembly's goal and the means it chose to attain the goal. We do not agree.

In Part II, we have set forth the basis for the classification. Code § 8.01-581.15 was enacted only after a thorough study had been made of the problem. The General Assembly made specific findings and a legislative judgment as to how the problem could be best addressed. Bearing in mind that the General Assembly is presumed to have acted within its constitutional powers and according its action the presumption of validity to which it is entitled, we cannot say that the means the General Assembly chose to promote a legitimate state purpose are unreasonable or arbitrary. Accordingly, we hold that the classification does not violate the Equal Protection Clause.

## IV

Two issues remain. Each involves the interpretation of statutes.

First, Wilson contends that the limit of $750,000 imposed by Code § 8.01-581.15 "applied as to each health care provider;" therefore, Wilson says she is entitled to recover $1,500,000. To support this contention, Wilson focuses upon the language in the statute which provides that "[i]n any verdict returned against *a health care provider*" the recovery shall not exceed $750,000. (Emphasis added.) The limit, Wilson states, "is addressed to '*a health care provider*.'" (Emphasis in original.) We reject this contention.

 The statute provides that "[i]n any verdict returned against a health care provider in an action for malpractice . . . the *total amount recoverable for any injury to . . . a patient* shall not exceed seven hundred fifty thousand dollars." (Emphasis added.) Wilson's claim was for an indivisible injury, *see, e.g., Cauthorn* v. *British Leyland, U.K., Ltd.*, 233 Va. 202, 205, 355 S.E.2d 306, 307-08 (1987), caused by the concurring negligence of each defendant. Giving Code § 8.01-581.15 its plain meaning, we hold that Wilson's damages are limited to a total of $750,000.

Second, relying upon Code § 8.01-38, Wilson contends that she is entitled to recover the full amount of the jury verdict against the hospital. At all times pertinent to this case, Code § 8.01-38 (1984 Repl. Vol.) provided as follows:

No [charitable] hospital . . . shall be immune from liability for negligence or any other tort on the ground that it is a charitable institution unless such hospital renders exclusively charitable medical services for which service no bill for service is rendered to, nor any charge is ever made to the patient, or unless the party alleging such negligence or other tort was accepted as a patient by such institution under an express written agreement executed by the hospital and delivered at the time of admission to the patient or the person admitting such patient providing that all medical services furnished such patient are to be supplied on a charitable basis without financial liability to the patient; provided, however, that a hospital . . . *which is insured against liability for negligence or other tort in an amount not less than*

> *$500,000 for each occurrence shall not be liable for damage
> in excess of the limits of such insurance.*

(Emphasis added.)

Wilson asserts that the italicized language should be interpreted to allow her to recover against a charitable hospital in a medical malpractice case an amount up to the maximum of the hospital's liability insurance coverage,[8] irrespective of the limitation on recovery imposed by Code § 8.01-581.15. The hospital, on the other hand, contends that Code § 8.01-581.15 limits the recoverable amount in a medical malpractice action against *any* health care provider; therefore, Code § 8.01-581.15 controls.

In 1976, two years after the enactment of Code § 8.01-38, the General Assembly enacted Code § 8.01-581.15. In 1986, however, the General Assembly amended Code § 8.01-38 as a result of a 1985 report submitted by the "Joint Subcommittee Studying Virginia's Medical Malpractice Laws." The joint subcommittee, recognizing that a potential ambiguity existed between Code §§ 8.01-38 and -581.15, recommended an amendment to Code § 8.01-38 "to clarify that the . . . cap imposed pursuant to § 8.01-581.15 does not apply to hospitals and that the $500,000 cap for hospitals is controlling."

Acting upon the joint subcommittee's recommendation to clarify Code § 8.01-38, the General Assembly amended and re-enacted the statute to provide that a hospital "which is insured against liability for negligence or other tort in an amount not less than $500,000 for each occurrence shall not be liable for damage in excess of the *limits of such insurance, or in actions for medical malpractice pursuant to Chapter 21.1 (§ 8.01-581.1 et seq.), the lesser of the limits of such insurance or $1 million.*"[9] (Emphasis added to reflect amended language.)

Wilson argues that because Code § 8.01-38 was enacted earlier in time and is more specific in nature, it "operates as an exception to [Code § 8.01-581.15,] the later or more general statute." Wilson also asserts that the 1986 amendment supports her position; otherwise the amendment was "utterly superfluous and meaningless."

---

[8] The record indicates that the hospital had liability insurance coverage up to $11,000,000.

[9] By 1986, the medical malpractice cap contained in Code § 8.01-581.15 had been increased from $750,000 to $1,000,000.

The hospital contends that Code § 8.01-581.15 controls because it limited the amount recoverable in a medical malpractice action against *any* health care provider. The hospital argues that the 1986 amendment supports its position because it is obvious that "the amendment was intended not to change the substantive effect of the statute but merely to *clarify* its application." (Emphasis in original.)

We conclude that Code § 8.01-581.15 controls, thereby limiting the recovery in this medical malpractice action to $750,000. Although Code § 8.01-38 was first in time, we do not agree that it was the more specific in nature. To the contrary, Code § 8.01-581.15 was more specific in nature because it dealt specifically with medical malpractice actions, while Code § 8.01-38 dealt generally with charitable hospitals' "liability for negligence or other tort." Additionally, we agree with the hospital that the 1986 amendment merely clarified the application of Code § 8.01-38.

### V

For all the foregoing reasons, we will affirm the trial court's judgment.

*Affirmed.*

RUSSELL, J., dissenting.

In my view, the medical malpractice "cap" imposed by Code § 8.01-581.15 offends the prohibitions against special laws contained in the Virginia Constitution. Article IV, § 14, of the Virginia Constitution provides, in pertinent part:

> The General Assembly shall not enact any local, special, or private law in the following cases:
> . . . .
> (3) Regulating the practice in, or the jurisdiction of . . . the courts . . . or providing or changing the methods of collecting debts or enforcing judgments . . . .
> . . . .
> (12) Regulating labor, trade, mining, or manufacturing . . . .

. . . .

(18) Granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity.

Article IV, § 15, provides, in pertinent part: "No private corporation, association, or individual shall be specially exempted from the operation of any general law, nor shall a general law's operation be suspended for the benefit of any private corporation, association, or individual."

The general law which constitutes our frame of reference is the entire body of statutory and common law which enables persons injured by tortious conduct to have free access to the courts, and to seek, as a matter of right, recovery of such damages as may be lawfully awarded by a properly constituted jury. A statute which purports to suspend or limit that right, favoring any special individual, class, or group, is, by definition, a special law.

The General Assembly enacted Code § 8.01-581.15 with the salutary legislative purpose of providing a remedy for a perceived social problem, the unavailability of medical malpractice insurance at affordable rates. Yet the unintended consequence of the Act was the creation of a class, described as "health care providers," clothed with a special privilege in the courts. Alone among the multitudes of corporations, associations, groups, and individuals who are daily subjected to tort actions in the courts, the members of this privileged elite (and those who insure them) are granted a special immunity from all damages exceeding $750,000 (now $1,000,000). All defendants not falling within the favored class lack that shield and must pay the full amount a jury may decide to award.

The other side of this unhappy equation is that Code § 8.01-581.15 creates a corresponding disfavored class — those who are so unfortunate as to suffer injury as a result of the negligence of a "health care provider." Their right to recover damages is limited by the Act while those injured by the torts of accountants, airlines, architects, barbers, bandits, banks, bus drivers, cooks, dog owners, engineers, financial advisors, horse trainers, golfers, hotel keepers, inebriates, jailors, kidnappers, lawyers, etc., retain an unlimited right of redress in the courts. This is precisely the kind of economic favoritism at which the special-laws prohibitions were aimed. As we recently observed in *Benderson Development Co. v.*

*Sciortino*, 236 Va. 136, 146, 372 S.E.2d 751, 756 (1988): "[T]he special-laws prohibitions contained in the Virginia Constitution are aimed squarely at economic favoritism, and have been so since their inception."

The majority opinion seeks to justify this legislative venture into the swamps of economic favoritism by invoking the test articulated in *Mandell* v. *Haddon*, 202 Va. 979, 991, 121 S.E.2d 516, 525 (1961): a classification will survive a special-laws challenge if it "bear[s] a reasonable and substantial relation to the object sought to be accomplished by the legislation." The majority opinion then refers to the legislative determination contained in the preamble to the Medical Malpractice Act (Acts 1976, c. 611) to the effect that it had become so difficult for health care providers to obtain insurance at affordable rates that public health, safety, and welfare were adversely affected. The legislative remedy was deemed to "bear a reasonable and substantial relation to the object sought to be accomplished" and to be a general law because it affected all health-care plaintiffs and defendants. In other words, because the legislature declared that a problem existed, and attempted to alleviate it, and because all members of the privileged class are treated alike, the attempt must be constitutional.

In my view, the majority's conclusion can only be reached by ignoring our own narrow interpretation of the Medical Malpractice Act and by resolutely closing our eyes to all concerns outside the narrow field of health care. In *Richman* v. *National Health Laboratories*, 235 Va. 353, 367 S.E.2d 508 (1988), a patient claimed injury due to the negligence of a medical laboratory which had erroneously misread a "pap smear" as "benign negative" when in fact it showed the patient to be suffering from active cervical cancer. The patient filed a "Notice of Claim" pursuant to the Medical Malpractice Act, naming the laboratory, certain physicians, and a professional corporation. The two-year statute of limitations ran before suit was filed, but the plaintiff patient relied on the tolling provisions of the Medical Malpractice Act. On appeal, we agreed with the trial court that the Act was too narrow to include the medical laboratory. We pointed to the statutory language: " 'Health care provider' means a person, corporation . . . licensed by this Commonwealth." Code § 8.01-581.1. The medical laboratory was licensed by the federal government and *inspected* by the Commonwealth. Therefore, we held that the laboratory was not a "health care provider" and fell outside the pur-

view of the Act. *Id.* at 357, 367 S.E.2d at 510-11. So also, one must assume, do all persons and organizations rendering health care which are not "licensed by this Commonwealth."

If the Medical Malpractice Act leaves uncovered clinical laboratories, their officers and agents, and all other persons engaged in the health care industry who are not "licensed by this Commonwealth," it is difficult to see any rational relationship between the Act and the avowed legislative purpose of solving the "liability insurance crisis" even within the narrow field of health care. The Act has simply selected a relatively small group of potential defendants and given them special protection. After more than a decade's experience with the Act, some commentators assert that it has had no appreciable effect on insurance rates. *See* Report of the Joint Subcommittee Studying the Liability Insurance Crisis and the Need for Tort Reform to the Governor and the General Assembly of Virginia, S. Doc. No. 11 (1987); Comment, *The Constitutional Attack on Virginia's Medical Malpractice Cap: Equal Protection and the Right to Jury Trial*, 22 U. Rich. L. Rev. 95, 96-97 n.8 (1987).

But there is no reason to limit our view to the area of health care alone.

> Because the power of judicial review is the only protection which exists against legislation which has become unconstitutional as applied, our role is not limited to examining the effect of legislative amendments. When the application of a law is fairly challenged under the Constitution, *it is our duty to examine its actual effect upon those subject to it,* regardless of the origin of the factors which combine to produce that effect.

*Benderson*, 236 Va. at 150, 372 S.E.2d at 758-59 (emphasis added). It is therefore incumbent on us to examine the effect of the Act in the wider context of all who must resort to the courts for redress.

Within and without the legal community, a controversy has raged for well over a decade concerning an alleged "liability crisis," or "insurance crisis," or "tort crisis." It is charged by some that liability insurance is scarce and expensive because of a conspiracy by insurers to increase rates to cover faulty investment and underwriting decisions; it is countercharged by others that the

problem is caused by greedy claimants, irresponsible lawyers, spendthrift juries, and unsound tort law. *See, e.g., Smith, Battling a Receding Tort Frontier: Constitutional Attacks on Medical Malpractice Laws*, 38 Okla. L. Rev. 195, 198-200 (1985); Comment, *Constitutional Challenges to Washington's Limit on Noneconomic Damages in Cases of Personal Injury and Death*, 63 Wash. L. Rev. 653, 655 (1988); Reske, *Was there a Liability Crisis?* Vol. 75 A.B.A.J. 46 (Jan. 1989); Daniels & Martin, *Civil Jury Awards Are Not Out Of Control*, Vol. 26, No. 1, A.B.A. Judges J. 10 (winter 1987). I pretend to no special knowledge that would enable me to allocate the blame for the alleged "crisis," if one indeed exists, but I think it fair to say that no unbiased observer could reasonably contend that the effects of the perceived "crisis" are limited to the field of health care.

News media and legal publications carry frequent reports of public-school athletic and social events cancelled, of swimming pools and playgrounds closed, of patriotic parades and fireworks displays discontinued, of useful products removed from the market, of municipal services curtailed, of businesses financially ruined, all attributed to the problem of tort liability and the expense or impossibility of insuring against it. Whether the problem is illusory or real, and if real, the allocation of responsibility for it, are questions beyond the scope of this case. It suffices to say that none of these wider aspects of the problem is related to health care, and none of them ever has been, or ever will be, ameliorated by the Medical Malpractice Act. In my view, therefore, when the actual effect of the statutory cap upon all those subject to it is fairly examined, it lacks any "reasonable and substantial relation" to the legislative objective.

It may be argued that the legislature, perceiving a problem, need not attempt its resolution at one stroke, but may move against it piecemeal. Thus, it would be constitutionally permissible to legislate with respect to the "liability crisis" within the field of health care at one session, to turn to the plight of municipalities at the next, and to other professions, businesses, and occupations at another. Fair enough. But the General Assembly enacted the Medical Malpractice Act in 1976, and has made no other discernible approach to the problem as it might affect others subject to the "liability crisis" in the courts during the ensuing twelve years. The special protection granted to the narrowly defined class of "health care providers" stands alone: a unique monument to the

effectiveness of a particularly vocal group which sought and found a privileged position in the courts.

I have no doubt that the General Assembly has full constitutional authority to limit or restrict all damages, or all unliquidated damages, or all noneconomic damages, or all punitive damages, with respect to all plaintiffs and all defendants regardless of their identities. Having determined that a "liability crisis" exists, the legislature may take rational and proper steps to create a remedy, including limitations on "the practice in, and jurisdiction of the courts." But it must do so evenhandedly. The remedy must not depend upon the identity of the defendant.

The familiar figure holding the scales of justice wears a blindfold. She should not be required to peer around it to ascertain whether the defendant is a "health care provider" before deciding what judgment to pronounce. The Virginia Constitution is particularly emphatic in proscribing laws which protect a select group of defendants or which limit the rights of a select group of plaintiffs to obtain redress in the courts of the Commonwealth.

Because I think Code § 8.01-581.15 to be unconstitutional as a special law, I would not reach the other questions presented upon appeal, but would reverse and reinstate the jury's verdict.

THOMAS, J., and POFF, Senior Justice, join in dissent.