# Holly Hill Farm Corporation

## v.

# Dorothy M. Rowe, et al.

Record No. 901208

April 19, 1991

Present: All the Justices

426

*George A. Somerville (Robert L. Brooke; Robert A. Canfield; Mays & Valentine; Canfield, Moore & Shapiro*, on briefs), for appellant.
*Edward Stehl, III*, on brief for appellees.

JUSTICE COMPTON delivered the opinion of the Court.

The question we confront in this declaratory judgment proceeding is whether the trial court erred in declaring a portion of Virginia's division fence law unconstitutional special legislation, as applied to a particular group of landowners.

▮ Initially, we will review the development of the law relating to division fences. At common law, every landowner's boundary line was a lawful fence, and when cattle trespassed upon another's land the cattle owner was liable in damages. *Burks Pleading and Practice* § 398 at 778 (4th ed. 1952).

▮ In Virginia, with certain exceptions not pertinent here, the common-law rule is not in force. Landowners must protect their crops against trespassing cattle by erecting a fence. Livestock owners are not required to enclose their land, and generally are not liable for damage caused by their trespassing animals unless they go upon land enclosed by a lawful fence. The reason assigned for adoption of this so-called "fence out" legislation is that the common-law rule "was not adapted to the nature and conditions of the country at the time of its settlement; that fencing materials were scarce; that there was a vast extent of land not occupied or cultivated, chiefly valuable for pasturage; and that the public interests would be best subserved by requiring each landowner to protect his crops by proper enclosures." *Id.* The General Assembly enacted "fence out" legislation as early as 1631: "EVERY man shall enclose his ground with sufficient fences uppon theire owne perill." 1 Hen. Stat., Act LXIII (1631-32) at 176 (1823).

■ In 1887, the General Assembly enacted a division fence law and provided a means whereby a landowner who desired to construct a fence between his property and that of an adjoining landowner could compel the latter to bear a "just proportion" of the expense of building and maintaining the fence. *See* Code of 1887, §§ 2053 to -2059. The 1887 law also permitted a landowner to avoid payment of the pro rata cost of erecting a division fence by choosing to allow the land to "lie open" and to remain unenclosed. *Id.* at § 2053.

■ The division fence law, now Code §§ 55-317 to -322, has been amended over the years since 1887. This controversy arises from an amendment enacted in 1970. Acts 1970, ch. 713. Currently, § 55-317 provides, with the 1970 amendment italicized:

"Adjoining landowners shall build and maintain, at their joint and equal expense, division fences between their lands, unless one of them shall choose to let his land lie open as hereinafter provided for, or unless they shall otherwise agree between themselves. *No owner of land used for industrial or commercial purposes, or subdivided into lots or parcels, adjoining lands used for agricultural purposes, when given notice by the owner of such adjoining lands under § 55-318 shall have the option of choosing to let his land lie open, but shall build one-half of such fence or be liable therefor.*

"Proceedings for the erection and repair of such fences shall be as set forth in the following sections."

Section 55-318 establishes the procedure to be used to force an adjoining landowner "to come forward and build his half" of a division fence.

The facts are undisputed. Appellant Holly Hill Farm Corporation operates a large cattle farm in Caroline County. In September 1989, Holly Hill filed several separate actions in the court below against appellees Dorothy M. Rowe, Dorothy Rowe Gravatt, Mary Frances Rowe Taylor, Frank B. Proctor, Lillie C. Proctor, and Frances R. Lambert (the Neighbors). In those actions, Holly Hill alleged that the Neighbors lived on subdivided property adjoining Holly Hill Farm, and that Holly Hill desired and intended to build a division fence between its land and the land of the Neighbors, invoking the provisions of the division fence law. Holly Hill asked the Neighbors to participate in the construction of the

fence and to pay half of the cost of erecting the fence. Asserting that the Neighbors had refused to contribute or participate in the construction, Holly Hill sought an award from each Neighbor of half the cost of erecting the division fence between the Farm and the particular Neighbor's property. Responding, the Neighbors denied any indebtedness to Holly Hill and stated they desired their land to lie open.

In December 1989, while the actions initiated by Holly Hill were pending, the Neighbors filed the present declaratory judgment proceeding asking the court to declare § 55-317 "unconstitutional as applied to them." Subsequently, after an April 1990 hearing, the trial court issued a letter opinion declaring "that the opt-out provision of the division fence law, as applied to owners of subdivided lots, is special legislation, and is therefore unconstitutional."

In the June 1990 order, from which we awarded Holly Hill this appeal, the trial court granted the relief sought by the Neighbors, and declared §§ 55-317 and -318 unconstitutional as applied. In addition, the court ordered its clerk to remove from the trial docket the actions instituted by Holly Hill against the Neighbors.

On appeal, Holly Hill contends that the trial court erred in declaring the subject enactments unconstitutional as applied to the Neighbors. Particularly, Holly Hill argues that the trial court erred in determining that the second sentence of § 55-317, which denies "opt-out" privileges to three types of owners, constitutes special legislation; is arbitrary, unreasonable, and oppressive; and violates the applicable provisions of the Constitution of Virginia. We agree with Holly Hill.

■ The Constitution provides, as pertinent, that the "General Assembly shall not enact any local, special, or private law . . . [g]ranting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity." Va. Const. art. IV, § 14(18). In addition, the Constitution also provides that in all cases enumerated in the foregoing section "and in every other case which, in its judgment, may be provided for by general laws, the General Assembly shall enact general laws." Va. Const. art. IV, § 15. Also, the Constitution provides: "Any general law shall be subject to amendment or repeal, but the amendment or partial repeal thereof shall not operate directly or indirectly to enact, and shall not have the effect of enactment of, a special, private, or local law." *Id.* Further, the Constitution provides: "No

private corporation, association, or individual shall be specially exempted from the operation of any general law, nor shall a general law's operation be suspended for the benefit of any private corporation, association, or individual." *Id.*

Settled principles of statutory construction apply to the always perplexing question whether a law is "special legislation." Every act of the General Assembly is presumed to be constitutional. Any reasonable doubt regarding the constitutionality of an enactment must be resolved in favor of the law's validity. And, the courts should not be concerned with the question whether the enactment is wise or proper because the legislature has plenary power, except where the federal or state constitution limits or prohibits that power. The courts will declare a statute null and void only where it is plainly repugnant to some constitutional provision. *Martin's Ex'rs* v. *Commonwealth*, 126 Va. 603, 611, 102 S.E. 77, 79 (1920). Nevertheless, "we have not hesitated to invalidate laws found, upon careful consideration, to violate the prohibition against special laws." *Benderson Development Co.* v. *Sciortino*, 236 Va. 136, 148, 372 S.E.2d 751, 757 (1988).

The proscriptions against special laws in the Constitution of Virginia "are aimed squarely at economic favoritism, and have been so since their inception." *Id.* at 146, 372 S.E.2d at 756. The purpose of the constitutional prohibitions, first adopted in the Constitution of 1902, "was to correct the perception that the General Assembly, in the nineteenth century, devoted an excessive amount of its time to the furtherance of private interests." *Id.* at 147, 372 S.E.2d at 756.

The essence of prohibited special legislation is the existence of an arbitrary separation of persons, places, or things of the same general class, with the result that some of them will, and some will not, be affected by the law. *Martin*, 126 Va. at 610, 102 S.E. at 79. Nonetheless, constitutional prohibitions against special laws do not proscribe classification. "All classifications import some degree of discrimination, but the legislature is not required to achieve 'mathematical nicety.'" *Mandell* v. *Haddon*, 202 Va. 979, 991, 121 S.E.2d 516, 525-26 (1961). The classification, however, "must be natural and reasonable, and appropriate to the occasion." *Martin*, 126 Va. at 612, 102 S.E. at 80. Routinely, legislation pertains to specific classifications of persons, places, or property. Such an enactment is nonetheless "general," provided the classification is reasonable, not arbitrary, and applies to all

persons who are similarly situated as well as to all parts of the State where like conditions exist. *Id.* at 618, 102 S.E. at 82.

Importantly, "the necessity for and the reasonableness of classification are primarily questions for the legislature. If any state of facts can be reasonably conceived, that would sustain it, that state of facts at the time the law was enacted must be assumed." *Id.* at 612-13, 102 S.E. at 80. *Accord Etheridge* v. *Medical Center Hospitals*, 237 Va. 87, 102, 376 S.E.2d 525, 533 (1989). And the burden is upon the assailant of the legislation to establish that it does not rest upon a reasonable basis, and is essentially arbitrary. *Martin*, 126 Va. at 614, 102 S.E. at 81.

Against this background, we turn to the law under scrutiny. Prior to the 1970 amendment, this Court, when rejecting a constitutional attack on Virginia's fence laws, said:

"We entertain no doubt of the validity of the laws under consideration. They were intended for the mutual benefit, convenience and welfare of all the citizens of the Commonwealth. . . . The Legislature has the power to regulate the relative rights and responsibilities of the proprietors of enclosed land, and the owners of stock that is allowed to run at large, and can, therefore, take from every man his remedy for a trespass by cattle, unless he enclose his lands with a lawful fence, without violating any right guaranteed by the Constitution of the State, or the United States." *Poindexter* v. *May*, 98 Va. 143, 149-50, 34 S.E. 971, 973 (1900).

The Neighbors contend, however, and the trial court found, that the 1970 amendment leaves them no option regarding contributions to a division fence erected by an adjoining agricultural landowner, but, in contrast, an adjoining agricultural landowner has such an option when the owner of subdivided property seeks to build a fence; thus, they are the victims of an unreasonable legislative classification. We disagree.

Guided by the foregoing controlling principles, we cannot say that § 55-317 generally, and the 1970 amendment particularly, is plainly repugnant to the constitutional proscriptions against special legislation. While some may say that the legislation is unwise, improper, or inequitable, these conclusions are for legislators to reach, and not for judges to assert in the guise of judicial interpretation. In our view, the Neighbors have failed to

carry their heavy burden to establish that the enactment does not rest upon a reasonable basis, and is essentially arbitrary.

The classification, discriminatory though it may be, is not unreasonable or arbitrary simply because it favors owners of land used for agricultural purposes over owners of industrial, commercial, or subdivided property. Without question, the "opt-out" provision applies to all persons who are similarly situated and applies to all parts of the Commonwealth where like conditions exist. So to that extent the provisions are "general."

But, does not the unequal treatment amount to invalid "special" treatment, and what is the justification for the General Assembly's action in enacting the 1970 amendment? As we have said, when any state of facts can be reasonably conceived that would support the law, such state of facts must be assumed by the court to have existed at the time of the enactment, and the law may not be declared by the court to be unreasonable or arbitrary.

We perceive that the 1970 General Assembly, unlike the 1887 General Assembly, was faced with continued urbanization in the land use of the Commonwealth evidenced by proliferation of residential subdivisions, commercial shopping centers, and industrial complexes. The legislature also was confronted with the division fence law which permitted owners of commercial, industrial, and subdivided property whose lands abut agricultural property to allow their land to lie open without being fenced. With this collision of interests between rural and urban Virginia, the mutual benefit, convenience, and welfare of all the Commonwealth's citizens demanded that conditions such as the probability of livestock roaming through residential neighborhoods, commercial shopping centers, industrial parks, and associated streets, be avoided.

Thus, the General Assembly in 1970 made a decision economically favorable to agricultural owners similar to the decision made in 1887 economically favorable to the crop grower, when cost-sharing provisions of the division fence law were enacted and later approved in *Poindexter, supra*. The legislature decided that agricultural owners should have primary control over establishment of division fences and that the cost of erecting a division fence between agricultural land and commercial, industrial, and subdivided land should be shared equally, and not be borne solely by the agricultural owner. At the same time, the owner of non-farm land, in most cases much smaller in area than the adjacent agricultural land, was denied the option of forcing

the adjacent farm owner to share the cost of a division fence proposed by the lot owner. A decision otherwise—that is, to allow the lot owner to force the farm owner to share the cost of the lot owner's individual division fence—could result in a mixture of fenced and unfenced lots adjoining farm land. The continuity of fencing adjoining farm land would depend solely on the whim of individual lot owners. Under those circumstances, one lot owner in a subdivision who refused to fence could destroy the integrity of a division fence desired by the remaining lot owners and would create the very conditions that the General Assembly sought to avoid. Thus, we do not find that the legislative decision to treat the classes of property owners differently was unreasonable, inappropriate, or arbitrary.

Consequently, we conclude that the trial court erred in declaring the statutes in question unconstitutional special legislation as applied to the Neighbors. Therefore, we will reverse the judgment below, direct the trial court to reinstate on its trial docket the prior actions brought by Holly Hill, and enter final judgment here in this case.

*Reversed and final judgment.*

JUSTICE LACY, with whom CHIEF JUSTICE CARRICO joins, dissenting.

The majority sustains the portion of the fencing laws involved here on the rationale that, at the time of enactment, the Commonwealth was faced with a "collision of interests between rural and urban Virginia, [and that] the mutual benefit, convenience, and welfare of all the Commonwealth's citizens demanded that conditions such as the probability of livestock roaming through residential neighborhoods, commercial shopping centers, industrial parks, and associated streets, be avoided." For these reasons, the legislature decided "the cost of erecting a division fence between agricultural land and commercial, industrial, and subdivided land should be shared equally, and not be borne solely by the agricultural owner."

Serving these mutual interests is laudable and supports a provision requiring co-financing of fences built between adjacent properties. The 1970 amendment, however, does not serve all interests equally. Rather, the provision requires cost sharing only

when the agricultural owner, in pursuit of his own interests, wishes to erect a fence, but leaves neighboring commercial, industrial, or subdivision landowners to rely on their own financial resources if they determine that a division fence is necessary to protect their interests.

The majority identifies a need for "continuity of fencing adjoining farm land" as justification for this unequal treatment favoring agricultural landowners. This rationale assumes that the agricultural tract will always be the larger tract, that all abutting landowners will be in the restricted categories, and that the agricultural landowner will always be the party seeking to install the fence. In fact, under the present law, the agricultural owner can either build the fence and pay half of the cost, or escape building expenses entirely by choosing to let his land "lie open" when adjacent landowners determine a fence between the properties is needed. "Continuity of fencing" is an insufficient rationale to sustain such disparate rights.

Requiring the owners of agricultural land, as well as owners of commercial, industrial, or subdivided land to contribute to the erection of a fence, regardless of who requests the fence, would serve the "collision of interests" and "continuity of fencing" goals. However, the one-sided approach contained in the 1970 amendments to the fencing laws does more than simply "favor" agricultural landowners; it constitutes economic favoritism which bears no reasonable or substantial relationship to the objective sought. *Benderson Development Co.* v. *Sciortino*, 236 Va. 136, 146, 372 S.E.2d 751, 756-57 (1988). As such, it is unjustified special legislation. I would affirm the trial court judgment.

CHIEF JUSTICE CARRICO, dissenting.

I join Justice Lacy in dissent. I believe as she does that a fence-law constitutes special legislation if it grants an option to one landowner but denies the option to another for no better reason than to insure continuity of fencing. But I feel constrained to add that I think the legislation under review may be constitutionally infirm in another respect.

In addition to denying an owner of industrial, commercial, or subdivided land the option of choosing to let his land lie open, the 1970 amendment provides that the owner of such land *"shall* build one-half of [a division] fence or be liable therefor." (Empha-

sis added.) This provision appears to make an owner of targeted land conclusively liable to build or to pay for building one-half of a division fence. If this be the effect of the legislation, it is woefully lacking in due process protection. I realize lack of due process is not the basis of the present attack upon the statute, but I would not want the Court's silence on the subject to be taken as indicating that the law passes constitutional muster in this respect.