COURT OF APPEALS OF VIRGINIA

Present: Judges Frank, Kelsey and Senior Judge Coleman
Argued at Richmond, Virginia

THE LAURELS OF BON AIR, LLC, d/b/a
  THE LAURELS OF BON AIR,
  OAK HEALTHCARE INVESTORS OF RICHMOND,
  VIRGINIA, INC., d/b/a THE LAURELS OF
  WILLOW CREEK, FOREST HILL
  CONVALESCENT CENTER, L.P., d/b/a
  RUXTON HEALTH AND REHABILITATION
  CENTER OF WESTOVER HILLS, RUXTON
  HEALTH CARE V, LLC, d/b/a RUXTON
  HEALTH CARE OF STRATFORD HILLS, AND
  WESTPORT OPERATIONS, LLC, d/b/a
  WESTPORT HEALTH CARE CENTER

                                         OPINION BY
v.          Record No. 1085-07-2        JUDGE D. ARTHUR KELSEY
                                         APRIL 22, 2008

MEDICAL FACILITIES OF AMERICA LIV
  LIMITED PARTNERSHIP, d/b/a BEAUFONT
  HEALTHCARE CENTER, MAPLE LEAF OF
  HANOVER COUNTY HEALTH CARE, INC.,
  d/b/a HANOVER HEALTHCARE CENTER,
  AND VIRGINIA DEPARTMENT OF HEALTH

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
Herbert C. Gill, Jr., Judge

W. Benjamin Pace (Martin A. Donlan, Jr.; Samuel T. Towell;
Williams Mullen, on briefs), for appellants.

D. Patrick Lacy, Jr. (H. Lane Kneedler; Kevin R. McNally; Reed
Smith LLP, on brief), for appellees Medical Facilities of America
LIV Limited Partnership and Maple Leaf of Hanover County
Health Care, Inc.

Matthew M. Cobb, Assistant Attorney General (Robert F.
McDonnell, Attorney General; David E. Johnson, Deputy Attorney
General; Jane D. Hickey, Senior Assistant Attorney General, on
brief), for appellee Virginia Department of Health.

The appellants in this case, five nursing homes, claim the Virginia Department of Health

should not have granted a request by a competitor to relocate hospital beds from one of its

facilities to two others pursuant to 2005 Va. Acts ch. 99 (House Bill 2316), the uncodified

predecessor of Code § 32.1-102.3:5.[1]  The appellants argue the Department unlawfully refused to recognize their "good cause" standing to participate in the administrative process.  The Department denied that request on the ground that 2005 Va. Acts ch. 99 (which we will refer to simply as the "2005 Relocation Act") exempted qualifying relocation requests from the plenary administrative process and, by doing so, precluded nonparties from obtaining standing to participate in the Act's more abbreviated and simplified process.

The appellants filed petitions for appeal to the circuit court pursuant to the Virginia Administrative Process Act (VAPA), Code § 2.2-4000 *et seq.*  The circuit court agreed with the Department's interpretation of the 2005 Relocation Act and dismissed the VAPA appeal because the appellants had no standing to pursue it.  We too find this reasoning persuasive and, thus, affirm the circuit court's dismissal order.

The appellants argue that this interpretation of the Act converts it into an unconstitutional "special" law in violation of Article IV, §§ 14-15, of the Virginia Constitution.  Though we question whether the appellants have standing in this case to challenge the constitutionality of the 2005 Relocation Act, we assume *arguendo* they do and nonetheless find the Act cannot be judicially vacated as an unconstitutional special law.

I.

Through various affiliates, Medical Facilities of America, Inc. (MFA) operates a nursing home, the Warsaw Healthcare Center, located in Warsaw, Virginia.  MFA also operates two other nursing homes, Hanover Healthcare Center, located in Hanover County, and Beaufont Healthcare Center, located in the City of Richmond.  Regulated by the Virginia Department of Health, MFA obtained certificates of public need to operate these nursing homes and others

---

[1] In 2007, the General Assembly reenacted 2005 Va. Acts ch. 99 without subsection (A)(3).  See Code § 32.1-102.3:5 (2007 Va. Acts ch. 398).

throughout the Commonwealth in various planning districts maintained by the Department. In 2005, MFA sought permission from the Department to relocate 120 beds from Warsaw Healthcare Center (located in one planning district) to Hanover Healthcare Center and Beaufont Healthcare Center (both located in another planning district).

Two of the appellant nursing homes wrote letters to the Department requesting an informal fact-finding conference pursuant to Code § 32.1-102.6. The Department refused to conduct a conference, asserting that the 2005 Relocation Act exempts the relocation request from the normal process governing certificates of public need. All of the appellants responded by filing petitions with the Department seeking "good cause" standing to participate in administrative hearings. The Department rejected the petitions and again explained that the 2005 Relocation Act removed MFA's relocation request from the normal hearing process.

The Department later approved MFA's request and issued certificates of public need (COPNs) authorizing the bed transfers. Claiming to be "aggrieved parties" from an agency "case decision," the appellants filed VAPA petitions for appeal in the Circuit Courts of Chesterfield County and the City of Richmond. In their petitions for appeal, the appellants asserted that the Department erroneously interpreted the 2005 Relocation Act. Properly construed, the appellants claimed, the Act did not exempt MFA's relocation request from the normal administrative process. And whether it did or not, they added, the Department's decision to approve the request without granting them a hearing should be judicially set aside as arbitrary and capricious.

In their VAPA petitions for appeal, the appellants also alleged that the 2005 Relocation Act violated the prohibition against "special, private, or local law" found in Article IV, §§ 14-15, of the Virginia Constitution. None of the appellants, however, filed any non-VAPA declaratory judgment claims or asserted any separate counts requesting either circuit court to exercise its general jurisdiction. Each of the petitions for appeal limited their claims and their jurisdictional

allegations to the judicial review provisions of VAPA and the underlying basic law governing the administrative regulation of nursing homes.

Both VAPA appeals were consolidated in the Chesterfield County Circuit Court. The appellees moved to dismiss the appeals on various grounds, including that the 2005 Relocation Act deprived appellants from obtaining standing as parties in the administrative proceeding and thus precluded their status as aggrieved parties for purposes of VAPA's judicial review procedures. The circuit court agreed and dismissed the VAPA case. The appellants appeal to us, claiming the circuit court erred in dismissing their VAPA appeals and in not addressing the merits of their claims.

II.

A. THE VAPA, THE BASIC LAW & STANDING PRINCIPLES

Under VAPA, the circuit court reviews the agency's action in a manner "equivalent to an appellate court's role in an appeal from a trial court." J. P. v. Carter, 24 Va. App. 707, 721, 485 S.E.2d 162, 169 (1997) (quoting Sch. Bd. v. Nicely, 12 Va. App. 1051, 1061-62, 408 S.E.2d 545, 551 (1991)) (internal quotation marks omitted). "In this sense, the General Assembly has provided that a circuit court acts as an appellate tribunal." Gordon v. Allen, 24 Va. App. 272, 277, 482 S.E.2d 66, 68 (1997) (citation omitted); Pence Holdings, Inc. v. Auto Ctr., Inc., 19 Va. App. 703, 708, 454 S.E.2d 732, 734-35 (1995).

VAPA, however, "does not vest circuit courts with appellate authority over all agency decisions." Giannoukos v. Va. Bd. of Med., 44 Va. App. 694, 699, 607 S.E.2d 136, 138 (2005). "Only those within the definition of a 'case decision' fall within the scope of the VAPA's judicial review provisions." Id. (citing Code § 2.2-4026). A "case decision" results from an agency proceeding involving a "named party." Code § 2.2-4001. A "named party" who loses an agency case decision ordinarily can seek judicial review under VAPA. A party who is not

- 4 -

"named," but a party nonetheless, can appeal to circuit court if he is genuinely "aggrieved" by the case decision, <u>see</u> Code § 2.2-4026, or qualifies as a "necessary party" essential to the resolution of the appeal, <u>Browning-Ferris Ind. v. Residents Involved</u>, 254 Va. 278, 282, 492 S.E.2d 431, 434 (1997), or is otherwise deemed a party under Rule 2A:1.

Nonparties, however, cannot appeal a case decision to the circuit court under VAPA. They can appeal, however, the agency's decision to *exclude* them from participating in the administrative process — which, in this context, involves the question whether the agency properly refused to recognize the appellants' "standing" to intervene and thereby acquire party status. <u>See</u> <u>Tidewater Psychiatric Inst., Inc. v. Buttery</u>, 8 Va. App. 380, 383-84, 382 S.E.2d 288, 290 (1989); <u>see</u> <u>also</u> <u>Chippenham & Johnston-Willis v. Peterson</u>, 36 Va. App. 469, 474 n.1, 553 S.E.2d 133, 136 n.1 (2001).

Whether an agency correctly refused to recognize the standing of a putative intervenor depends on the criteria for standing, if any, adopted by the underlying administrative statute, the "basic law" as Code § 2.2-4001 calls it. The basic law may provide broader standing, <u>see</u>, e.g., <u>Harrison v. Ocean View Fishing Pier, LLC</u>, 50 Va. App. 556, 568, 651 S.E.2d 421, 427 (2007), or narrower standing, <u>EDF v. State Water Control Bd.</u>, 12 Va. App. 456, 462, 404 S.E.2d 728, 731 (1991), than the default standard adopted by VAPA.

When the basic law refuses to recognize *any* standing for nonparties seeking to participate in the administrative process, VAPA respects that refusal. While VAPA seeks to "standardize court review" of agency action, it does so "*save* as laws hereafter enacted may *otherwise* expressly provide." Code § 2.2-4000 (emphasis added); <u>see</u> <u>also</u> <u>Health Sys. Agency</u> <u>v. Stroube</u>, 47 Va. App. 299, 308, 623 S.E.2d 444, 449 (2005) (recognizing that the VAPA "governs the appeals process for administrative decisions, unless the agency's basic law provides otherwise").

## B. THE RELOCATION ACT & "GOOD CAUSE" STANDING

In this case, the circuit court reasoned that the 2005 Relocation Act so completely exempted the relocation request from the normal administrative process that no "good cause" standing for nonparties could be recognized. The court also found no other statutory basis, either in the basic law or VAPA, granting the appellants standing to seek judicial review of the relocation approval. For this reason, the court held the VAPA appeal must be dismissed. We agree with the court's reasoning and conclusion.

The basic law governing medical care facilities, including nursing homes, states that no "person shall commence any *project* without first obtaining a certificate" issued by the Department's Commissioner of Health. Code § 32.1-102.3(A) (emphasis added). The definition of "project" under Code § 32.1-102.1 includes any "increase in the total number of beds" in an "existing medical care facility" like a nursing home. The Department cannot issue a certificate of public need "unless the Commissioner has determined that a public need for the project has been demonstrated." Code § 32.1-102.3(A).

Code § 32.1-102.6 provides procedures for obtaining certificates of public need for projects. Subsection A provides: "To obtain a certificate for a project, the applicant shall file a completed application for a certificate with the Department and the appropriate health planning agency." Subsection B describes various reviews, including a public hearing near where the "project" has been proposed. Subsection D requires the Department to make a timely determination on whether the "project" satisfies the public-need criteria. Subsection D makes this determination, with some minor exceptions, subject to "the provisions of the Administrative Process Act" and permits individuals to seek "good cause" standing to intervene in the proceeding and request an informal fact-finding conference under the VAPA. See Code § 32.1-1022.6 (D).

The 2005 Relocation Act, however, adds a structural proviso qualifying the broad reach of the basic law. The Act provides in part:

> A. *Notwithstanding (i) the provisions of §§ 32.1-102.3 and 32.1-102.3:2, (ii) any regulations of the Board of Health establishing standards for the approval and issuance of Requests for Applications, or (iii) the provisions of any current Requests for Applications issued by the Commissioner of Health pursuant to § 32.1-102.3:2, the Commissioner of Health shall accept applications and may issue certificates of public need for nursing home beds when such beds are a relocation from one facility to another facility or facilities under common ownership or control, regardless of whether they are in the same planning district, if, as of December 31 of the year preceding the year in which relocation is proposed, the following criteria are met . . . .*

> B. *A relocation of nursing home beds under the circumstances described herein shall not constitute a "project" as defined in § 32.1-102.1.* An entity may not relocate more than two-thirds of the total number of beds for which the facility was licensed prior to any relocation pursuant to this section. Any restrictions that apply to the certificate at the time of the relocation shall remain in effect following the relocation.

2005 Va. Acts ch. 99 (emphasis added).

The circuit court correctly read the 2005 Relocation Act to provide a simplified and abbreviated process for approving or disapproving requests for bed relocations from one nursing home to another under common ownership or control. Subsection B makes clear that a qualifying relocation "shall *not* constitute a '*project*' as defined in § 32.1-102.1." (Emphasis added.) The opening sentence of Code § 32.1-102.1 provides that its statutory definitions, including the definition of "project," apply throughout Article 1.1 (entitled "Medical Care Facilities Certificates of Public Need") unless context dictates otherwise. By exempting qualifying relocations from the definition of "project," subsection B of the 2005 Relocation Act renders inapplicable Article 1.1's elaborate procedures governing the approval of certificates of public need for *projects* — including Code § 32.1-102.6's procedures for holding public hearings and granting good-cause standing to nonparties.

- 7 -

Subsection A of the 2005 Relocation Act reinforces the point by making equally clear that the Department shall process the request "[n]otwithstanding" Code § 32.1-102.3. That statute requires "projects" to be supported by a showing of public need and details the multitude of considerations governing the agency's exercise of discretion. In short, the 2005 Relocation Act not only exempts qualifying relocation requests from Article 1.1's procedures applicable to "projects," the Act also negates the very statute (Code § 32.1-102.3) putative objectors would rely upon to challenge the agency's discretion on the ultimate issue of public need.[2] In doing so, the 2005 Relocation Act eschews any "judicially manageable standard of review," 3 Richard J. Pierce, Jr., Administrative Law Treatise § 17.8, at 1303 (4th ed. 2002), which the courts could employ to test the legitimacy of the appellants' challenge of the agency's exercise of discretion.[3]

In this respect, VAPA is "virtually identical," State Bd. of Health v. Godfrey, 223 Va. 423, 434 n.6, 290 S.E.2d 875, 881 n.6 (1982) (citation omitted), to the Federal Administrative Procedure Act. Code § 2.2-4000's standardization of judicial review "*save* as laws hereafter enacted may otherwise expressly provide" parallels 5 U.S.C. § 701(a), which provides for judicial review of federal agency action "*except* to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." (Emphasis added.) Agency action is committed to agency discretion by law where a statute is "drawn in such broad terms that in a given case there is no law to apply." Inova Alexandria Hosp. v. Shalala, 244 F.3d

_____

[2] The appellants contend that certain enforcement provisions, like Code § 32.1-102.4(C)(2) and (E), might likewise be rendered inapplicable if subsection B of the 2005 Relocation Act is read literally. The excision of certain relocation requests from the "project" definition, however, may or may not have any impact on the Department's enforcement powers. That question must await a litigable controversy in which the issue is directly in play.

[3] Appellants also argue that they should be considered necessary parties. We find no merit in this assertion. They cannot be necessary parties without first being parties. See, e.g., Browning-Ferris Ind., 254 Va. at 282-83, 492 S.E.2d at 434 (holding a permittee, the named party in an administrative case decision, is necessary to the VAPA appeal of the permit). Because the appellants lacked standing to intervene in the administrative process, *a fortiori*, they cannot be necessary to the judicial process on appeal.

342, 346 (4th Cir. 2001) (citation omitted). "There is no law to apply if 'the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" Id. (quoting Heckler v. Chaney, 470 U.S. 821, 830 (1985)).

In this case, the 2005 Relocation Act authorizes the Department's exercise of discretion by providing that the Commissioner "may" issue a certificate to a qualifying relocation request. See 2005 Va. Acts ch. 99. The Act, however, also provides that this exercise of discretion would remain wholly unfettered by any consideration of the various "public need" factors of Code § 32.1-102.3. By framing the subject that way, the 2005 Relocation Act includes no meaningful standard by which any court could judge the reasonableness of the agency's action when attacked by those who would otherwise have "good cause" standing under Code § 32.1-102.6.[4]

C. THE CIRCUIT COURT'S REFUSAL TO ADJUDICATE THE CONSTITUTIONAL CLAIM

Having concluded the appellants lacked VAPA standing to pursue an appeal, the circuit court refused to adjudicate the merits of the appellants' claims — including their assertion that the 2005 Relocation Act violated the prohibition against "special, private, or local law" found in Article IV, §§ 14-15, of the Virginia Constitution. We understand the court's reluctance. The appellants made that allegation in their VAPA petitions for appeal predicated solely on the circuit court's VAPA appellate jurisdiction. The appellants did not file separate complaints seeking declaratory or injunctive relief predicated on the circuit court's non-VAPA general jurisdiction. See, e.g., St. Luke Hosp. v. Health Policy Bd., 913 S.W.2d 1 (Ky. App. 1996)

---

[4] The appellants argue that subsection B, as we read it, would preclude the application of Code § 32.1-102.3 even without the "[n]otwithstanding" proviso of subsection A. Our interpretation, they conclude, should be rejected by the rule of statutory interpretation against treating some statutory language as superfluous. We acknowledge the point, but cannot treat it as dispositive because Virginia courts "do not resort to the rules of statutory interpretation where, as here, language contained in a statute is free from ambiguity." Mouberry v. Commonwealth, 39 Va. App. 576, 582 n.2, 575 S.E.2d 567, 570 n.2 (2003) (quoting Wilder v. Attorney Gen., 247 Va. 119, 124, 439 S.E.2d 398, 401 (1994)).

(entertaining a claim for declaratory judgment that a statutory exception to the general COPN law was unconstitutional special legislation). The limited jurisdiction authorized by VAPA "does not extend to any matter 'subject by law to a trial de novo in any court.'" The Mattaponi Indian Tribe v. Commonwealth, 43 Va. App. 690, 708, 601 S.E.2d 667, 676 (2004) (quoting Code § 2.2-4025(A)), aff'd, 270 Va. 423, 621 S.E.2d 78 (2005).[5]

Appellants argue on appeal to us the seemingly circular thesis that they have VAPA standing to challenge an allegedly unconstitutional deprivation of VAPA standing. They point out, however, the antithesis of their position is equally circular — that a VAPA court cannot enforce an allegedly unconstitutional statutory deprivation of VAPA standing on the ground that the deprived litigant has no standing. We see no need in this case to choose between these two mutually exclusive, but equally anfractuous, theories of VAPA standing. Assuming *arguendo* the appellants have standing in this VAPA appeal to challenge the constitutionality of the law that eliminates their standing in the first place, we find no merit in their constitutional challenge.

The prohibitions against "special, private, or local law" found in Article IV, §§ 14-15, of the Virginia Constitution track the minimum rationality requirements employed by longstanding due process and equal protection doctrines. Virginia courts "apply the so-called 'rational basis' test" when testing the constitutionality of legislation "under due process, equal protection, and special legislation provisions." Willis v. Mullett, 263 Va. 653, 659, 561 S.E.2d 705, 709 (2002). The special laws prohibitions recognize "the necessity for and the reasonableness of classification are primarily questions for the legislature. If any state of facts can be reasonably conceived, that would sustain it, that state of facts at the time the law was enacted must be

---

[5] If the appellants had filed freestanding, non-VAPA claims seeking declaratory or injunctive relief within the circuit court's general jurisdiction, our segmented appellate authority would preclude us from hearing the case. See The Mattaponi Indian Tribe, 43 Va. App. at 709-10, 606 S.E.2d at 676-77, aff'd, 270 Va. at 438 n.6, 621 S.E.2d at 86 n.6.

assumed." Jefferson Green Unit Owners Ass'n v. Gwinn, 262 Va. 449, 459, 551 S.E.2d 339, 345 (2001) (citation omitted).

Litigants challenging a statute as an illegitimate special law shoulder a "heavy burden," Holly Hill Farm Corp. v. Rowe, 241 Va. 425, 432, 404 S.E.2d 48, 51 (1991), one calculated to safeguard the maxim that all "legislative acts are 'presumed to be constitutional,'" Boyd v. County of Henrico, 42 Va. App. 495, 506, 592 S.E.2d 768, 774 (2004) (*en banc*) (quoting In re Phillips, 265 Va. 81, 85, 574 S.E.2d 270, 272 (2003)). "This presumption is 'one of the strongest known to the law.'" Id. at 507, 592 S.E.2d at 774 (citation omitted). "Under it, courts must 'resolve any reasonable doubt' regarding the constitutionality of a law in favor of its validity." Id. (citations omitted). "To doubt is to affirm." Id. (citation omitted).

The 2005 Relocation Act exempts a specific class of bed transfers from an administrative process that has been criticized by some as inefficient and expensive. See generally Report of the Special Joint Subcommittee Studying Certificate of Public Need, Sen. Doc. No. 6, at 46 (2001) (noting the "strong feeling that the certificate of public need process needs streamlining and could be reduced"). For bed transfers meeting the applicable conditions, the 2005 Relocation Act provides a streamlined, non-litigious process to seek administrative approval.

The appellants argue that if the Act truly has this streamlining effect, it should be struck down as an example of economic favoritism because it applies only to "corporations owning multiple nursing homes" and, as a result, "only large, influential corporations stand to benefit" from the Act's abbreviated procedures. See Appellants' Br. at 34. To make matters worse, the appellants contend, the General Assembly specifically intended the Act to benefit only MFA. See Appellants' Br. at 34. We disagree with the reasoning underlying both assertions.

To begin with, it is true the Act applies only to companies owning or controlling at least two nursing homes. A company owning one nursing home cannot transfer beds to another home

owned and operated by some other company. This distinction, however, cannot be characterized as a "purely arbitrary" legislative classification, Martin's Ex'rs v. Commonwealth, 126 Va. 603, 612, 102 S.E. 77, 80 (1920), devoid of any rational basis. Limiting the Act's reach to nursing homes under common ownership or control discourages the creation of a *de facto* market in bed relocations between disparate corporate entities and places the entire relocation effort under the settling effect of a unified business plan.

Whether limiting the Act to commonly owned or operated nursing homes represents sound public policy, we are not competent to say. Judicial review does not evaluate the "propriety, wisdom, necessity and expediency" of legislation. Mouberry v. Commonwealth, 39 Va. App. 576, 585-86, 575 S.E.2d 567, 571 (2003) (citations omitted). We ask only whether the statutory classification erects an irrational, arbitrary distinction — one that no conceivable state of facts could reasonably sustain. Jefferson Green Unit Owners Ass'n, 262 Va. at 459, 551 S.E.2d at 345. None of the appellants' arguments rise to this level.

For similar reasons, we cannot accept the appellants' allegation that the General Assembly enacted a facially neutral statute with the *sub silentio* intent that it "inure to the benefit of MFA alone." Appellants' Br. at 34. The argument rests on the factual assumption that, in 2005, MFA operated the only nursing home business in the Commonwealth that could have met the criteria of the Act. MFA rejects this assumption, arguing that the legislative history of the Act, including the floor statements of the patron, demonstrates that at least five or six nursing homes might have met the criteria in 2005.

We think this factual debate misses the point. The question is not the size of the statutory class in 2005. The Act is not a one-time piece of legislation applicable only to nursing homes operating during the year of its enactment. The Act applies *in perpetuity* and shuts the class door fully only when repealed. Even if the 2005 statutory class size benefited a favored few, the

question is whether it would forever do so. We can strike down legislation as an unconstitutional special law only when "the class established by its provisions is at once so narrow and so arbitrary that duplication of its content is to be ranked as an unexpected freak of chance, a turn of the wheel of fortune defying probabilities." Peery v. Va. Bd. of Funeral Dirs. & Embalmers, 203 Va. 161, 167, 123 S.E.2d 94, 98 (1961) (citation omitted).

Such an assertion cannot be made here. It would hardly be an "unexpected freak of chance" or a "turn of the wheel of fortune defying probabilities," Peery, 203 Va. at 167, 123 S.E.2d at 98 (citation omitted), for the 2005 Relocation Act to benefit future nursing homes. The nursing home industry, like most economic markets, is far from static. Corporate reorganizations and asset acquisitions can be hypothesized that could create conditions consistent with the criteria of the Act. To be sure, the General Assembly may have even intended the Act to encourage just that.

It may well be that, at least in the foreseeable future, the 2005 Relocation Act will apply only to a relatively small portion of the nursing home industry. "Laws may be made to apply to a class only," however, "and that class may be in point of fact a small one, provided the classification itself be a reasonable and not an arbitrary one, and the law be made to apply to all of the persons belonging to the class without distinction." Ex parte Settle, 114 Va. 715, 718-19, 77 S.E. 496, 497 (1913). The facially neutral criteria of the Act insures that its streamlined process, while arguably limited to a small sector of the nursing home industry, may be accessed by *any* applicant meeting the statutory criteria.

Finally, we respectfully decline the suggestion of our colleague in dissent to remand this case to the agency for it to conduct an evidentiary hearing on the constitutionality of the 2005 Relocation Act. Nothing in VAPA authorizes an administrative agency to conduct evidentiary hearings into the constitutionality of legislation and to make factual findings which, under Code

- 13 -

§ 2.2-4027, would be entitled to judicial deference on appeal to the circuit court.[6] Vested with the *sui generis* power of judicial review, the judiciary alone must perform whatever factfinding is necessary to fulfill this task. It cannot be delegated, in whole or in part, to the executive branch of government.

III.

Because the 2005 Relocation Act precludes the appellants from acquiring standing to seek judicial review of the agency's actions in this case, the circuit court properly dismissed this VAPA appeal. Assuming *arguendo* the appellants nonetheless have standing to challenge the constitutionality of the Act, we find no merit in their challenge.

<u>Affirmed.</u>

---

[6] "On appeal of an agency decision, 'the sole determination as to factual issues is whether substantial evidence exists in the agency record to support the agency's decision. The reviewing court may reject the agency's findings of fact only if, considering the record as a whole, a reasonable mind necessarily would come to a different conclusion.'" <u>Chippenham & Johnston-Willis</u>, 36 Va. App. at 475, 553 S.E.2d at 136 (citation omitted); <u>see</u> <u>also</u> <u>Alliance to Save the Mattaponi v. Commonwealth</u>, 270 Va. 423, 441, 621 S.E.2d 78, 88 (2005).

Frank, J., dissenting.

Because the majority opinion assumes the constitutionality of House Bill 2316 (HB 2316) and then interprets HB 2316 to preclude judicial review under the Virginia Administrative Process Act (VAPA), I respectfully dissent. I would reverse the order of the trial court dismissing appellants' claims for lack of standing, and remand to the trial court with instructions to remand this case to the Commissioner to determine whether HB 2316 is unconstitutional special legislation.

BACKGROUND

Medical Facilities of America, Inc. (MFA) is a Virginia corporation that has an ownership interest in and/or manages at least 30 nursing homes in Virginia. MFA plays some role in the ownership and operation of the three nursing homes at issue in this appeal: Warsaw Healthcare Center (Warsaw HCC), located in Planning District 17, Hanover Healthcare Center (Hanover HCC), located in Planning District 15, and Beaufont Healthcare Center (Beaufont HCC), located in Planning District 15.

Warsaw HCC has housed 180 licensed nursing home beds in Warsaw, Virginia, since 1985. Citing the weak financial performance of Warsaw HCC,[7] MFA sought to transfer 60 of the beds at Warsaw HCC to Hanover HCC and 60 of the beds to Beaufont HCC, both in a different planning district.

Code §§ 32.1-102.1 to 32.1-102.13 detail the requirements and procedures for obtaining a COPN for medical care facilities. Code § 32.1-102.3 provides, in part:

---

[7] MFA attributed the weak financial performance to "poor survey results and a Department of Justice investigation," staff shortages, and the addition of a new nursing home facility in the Warsaw area. MFA noted that the combination of these factors led them to rely on outside agencies to staff their nursing positions and resulted in the facility operating at a loss.

- 15 -

No person shall commence any project[8] without first obtaining a certificate issued by the Commissioner. No certificate may be issued unless the Commissioner has determined that a public need for the project has been demonstrated. . . . Any decision to issue or approve the issuance of a certificate shall be consistent with the most recent applicable provisions of the State Medical Facilities Plan . . . .

(Footnote added).

The statute then lists twenty factors that "the Commissioner shall consider" when determining "whether a public need for a project has been demonstrated." Code § 32.1-102.3(B). Those factors include the recommendation of the relevant health planning agency, the "need that the population served or to be served by the project has for the project," "the relationship of the project to the existing health care system of the area in which the project is proposed," and "the efficiency and appropriateness of the use of existing services and facilities in the area similar to those proposed." Code § 32.1-102.3(B).

For applications for a COPN to increase the number of nursing home beds in a planning district, Code § 32.1-102.3:2 requires the Commissioner to "approve, authorize or accept" only those applications that "are filed in response to Requests for Applications (RFAs)."

Further, Code § 32.1-102.6 sets out administrative procedures that govern the filing and review of any application for a COPN. Those administrative procedures require the regional health planning agency to review each application for a COPN and to hold a public hearing on each application for a COPN. Both the regional health planning agency and the Department of Health's Division of Certificate of Public Need (DCOPN) review the applications and provide recommendations to the Commissioner. In addition, Code § 32.1-102.6 provides a process for a

---

[8] Code § 32.1-102.1 defines "project" as, among other things, "[a]n increase in the total number of beds or operating rooms in an existing medical care facility." This statute categorizes a nursing home as a "medical care facility." Thus, the applications for the COPNs involved here would normally fall under the definition of "project" for purposes of this statute.

person to seek and obtain "good cause standing"[9] as a party to the case and, after obtaining such status, to request an informal fact-finding conference (IFFC) to be convened. This IFFC allows all of the parties involved to provide additional information for the Commissioner to consider when determining whether to approve the application for a COPN. The regional health planning agency or DCOPN can also request an IFFC.

In the 2005 legislative session, the Virginia legislature passed HB 2316, which provides:

> A. Notwithstanding (i) the provisions of §§ 32.1-102.3 and 32.1-102.3:2, (ii) any regulations of the Board of Health establishing standards for the approval and issuance of Requests for Applications, or (iii) the provisions of any current Requests for Applications issued by the Commissioner of Health pursuant to § 32.1-102.3:2, the Commissioner of Health shall accept applications and may issue certificates of public need for nursing home beds when such beds are a relocation from one facility to another facility or facilities under common ownership or control, regardless of whether they are in the same planning district, if, as of December 31 of the year preceding the year in which relocation is proposed, the following criteria are met:
>
> 1. The occupancy rate of the facility seeking to relocate beds, based upon the total number of beds for which the facility is licensed, was less than 67 percent;
>
> 2. Greater than 25 percent of the residents of the facility from which beds are to be relocated, immediately prior to moving the facility, resided outside the planning district in which the facility is located;
>
> 3. More than 10 percent of the nursing hours of the facility from which beds are to be relocated were performed by temporary agency staffing; and

---

[9] Code § 32.1-102.6(G) defines "good cause" as:

> (i) there is significant relevant information not previously presented at and not available at the time of the public hearing, (ii) there have been significant changes in factors or circumstances relating to the application subsequent to the public hearing, or (iii) there is a substantial material mistake of fact or law in the Department staff's report on the application or in the report submitted by the health planning agency.

4. Any facility to which beds are to be relocated has experienced an average occupancy rate that meets or exceeds 90 percent.

B. A relocation of nursing home beds under the circumstances described herein shall not constitute a "project" as defined in § 32.1-102.1. An entity may not relocate more than two-thirds of the total number of beds for which the facility was licensed prior to any relocation pursuant to this section. Any restrictions that apply to the certificate at the time of the relocation shall remain in effect following the relocation.

On August 8, 2005, in response to this legislation, DCOPN promulgated special procedures and time frames "for processing a request for relocation of nursing home beds under the provisions of HB 2316." DCOPN interpreted HB 2316 to require a "simplified and abbreviated process for handling such requests." Further, DCOPN noted that HB 2316 "directs" the Commissioner to "take certain actions *notwithstanding* the statutory criteria for determining need" and "*notwithstanding* the administrative procedures that apply to review of *projects*." (Emphasis in original).

Essentially, the special procedures provided that the Commissioner would review an application pursuant to HB 2316 to determine only (1) whether it met the classification criteria set out in the legislation, and (2) that "it is not likely to result in significant harm to affected nursing home residents or to other citizens of the Commonwealth." The procedures then set forth an abbreviated time frame for reviewing the applications, and specified that an IFFC would occur only if it "is required as a result of the recommendation of the Department of Health staff." The only role for the regional health planning agency was an opportunity "to review an HB 2316 request and provide its comments to the Commissioner," but the procedures did not provide for a public hearing or for the regional health planning agency to request an IFFC. Further, the procedures did not provide for any other person to apply for good cause standing, or to request an IFFC.

- 18 -

On September 20, 2005, MFA applied for a COPN, pursuant to HB 2316, to transfer 60 nursing home beds from Warsaw HCC to Beaufont HCC (the Beaufont application). On October 7, 2005, MFA applied for a COPN, pursuant to HB 2316, to transfer 60 nursing home beds from Warsaw HCC to Hanover HCC (the Hanover application). If approved, Warsaw HCC would be left with no nursing home beds.[10]

On October 25, 2005, the Central Virginia Health Planning Agency (CVHPA) held a public hearing, contrary to the procedures outlined by DCOPN.[11] MFA contended that the statute did not provide for a public hearing, or for a recommendation from CVHPA, but participated in the hearing as a courtesy to the agency. CVHPA received seven letters of opposition to the transfers of beds, three from family members of residents at Warsaw HCC, one from the administrator of the hospital located near Warsaw HCC, and three from nursing home facilities located in Planning District 15.

Based on this "significant provider and consumer opposition," and their review of the application under the twenty factors in Code § 32.1-102.3(B), CVHPA recommended the Commissioner deny both applications submitted by MFA. Specifically, CVHPA noted that the transfer of these beds into Planning District 15 violated provisions of the State Medical Facilities Plan, creating an unnecessary and harmful surplus of nursing home beds in Planning District 15 and a deficiency of nursing home beds in Planning District 17. The surplus of beds would negatively impact occupancy rates and the financial viability of existing nursing homes, while

---

[10] Although Warsaw HCC had a COPN to operate 180 nursing home beds, beginning in September 2004, MFA began reducing the number of occupied beds at Warsaw HCC with the goal of reaching 120 occupied beds by December 31, 2004.

[11] CVHPA noted that they disagreed with the exclusion of MFA's applications from the normal review process for COPNs, remarking that prior legislation passed by the legislature had only removed the RFA process from the required COPN procedures. Further CVHPA believed that, under their Memorandum of Agreement with the Department of Health, they were mandated to conduct the same review of all COPN applications. As such, CVHPA proceeded as they would with any other application, notwithstanding the special procedures issued by DCOPN.

the deficiency of beds would have "a negative impact on the economic viability of area hospitals." Additionally, CVHPA pointed to alternatives to the transfer of beds that would diminish the negative consequences for both Warsaw HCC's service area and Planning District 15.

On November 18, 2005, CVHPA requested that the Commissioner convene an IFFC regarding MFA's applications. The Commissioner responded that, because applications under HB 2316 are not "projects" for purposes of the COPN administrative process, "no IFFC is required."

DCOPN released its review and recommendations on November 14, 2005, regarding the Hanover application, and on November 30, 2005, regarding the Beaufont application. For many of the same reasons cited by CVHPA, DCOPN determined that neither application had "a great deal of overall merit" when considered alone and that DCOPN would not normally recommend approval. Moreover, when both applications were considered together, DCOPN determined that approval of both applications "would very likely cause serious and long-lasting harm to the nursing home services capability of [Planning District] 17 and [Planning Districts] 17 and 18 combined, and would likely cause undue, though probably relatively modest harm to some or perhaps many nursing home providers in [Planning District] 15." However, DCOPN recommended approval of the applications solely because the applications met the criteria set out in HB 2316, and because DCOPN believed that the design of HB 2316 did not permit consideration of the merit of the applications on any other criteria.[12]

---

[12] Indeed, in an internal memorandum to the Commissioner dated December 9, 2005, DCOPN stated that they recommended approval of the applications "only because the language of HB 2316 seems to leave us no choice" and that approval was "clearly harmful to the public interest that the COPN program is intended to serve."

Appellants filed separate petitions for good cause standing with the Commissioner in the consideration of MFA's applications for COPNs, each requesting party status in the case. Appellants also asked the Commissioner to convene an IFFC to consider the lawfulness of the applications under HB 2316, even if DCOPN recommended approval of the applications, and argued that HB 2316 constituted unconstitutional special legislation. In response, the Commissioner stated that, "[i]nasmuch as HB 2316 expressly removes any proposed relocation submitted pursuant to it from the category of those things that are projects, your attempt to petition to show good cause in relation to the proposed relocation cannot be accepted."

On December 15, 2005, the Commissioner approved the Hanover application for a COPN to transfer 60 beds from Warsaw HCC, stating, "I have concluded that approval of the request is warranted, based on the following finding: The application meets each of the criteria for its acceptance and possible approval that are set forth by HB 2316 of the 2005 General Assembly." On December 19, 2005, the Commissioner approved the Beaufont application for a COPN to transfer 60 beds from Warsaw HCC on identical grounds.

Appellants filed petitions for appeal in the trial court,[13] arguing that: the Commissioner erred in failing to hold hearings on the applications, the Commissioner erred in denying appellants' good cause petitions, the Commissioner erred in approving the applications where DCOPN and CVHPA found that the applications were without merit and were harmful to the public interest, and the Commissioner erred by giving effect to unconstitutional special legislation.

_____

[13] Three of the appellants filed their petitions for appeal in the Circuit Court for Chesterfield County, while the remaining two appellants filed their petitions for appeal in the Circuit Court for the City of Richmond. These filings were based on the different physical locations of each appellant. As the petitions in Chesterfield County were filed first, venue was transferred in the cases arising in the City of Richmond to Chesterfield County and the separate petitions were consolidated into one case.

- 21 -

MFA and the Virginia Department of Health filed motions to dismiss appellants' petitions, arguing that, as appellants were not named parties to the proceedings before the Commissioner and were not "parties aggrieved" under the VAPA, appellants lacked standing to bring the appeals.

The trial court, after hearing oral argument, granted the motions to dismiss appellants' petitions for appeal. The trial court determined that, based on its reading of HB 2316, "the procedural mandates of § 32.1-102, et. seq. do not apply." Appellants' only avenue for appeal, the trial court reasoned, was through the VAPA. The trial court ruled that appellants lacked standing to appeal under the VAPA, as "the correspondence of the Commissioner are not 'case decisions'" and, further, appellants were neither "necessary parties to the proceeding" nor "'aggrieved parties' to the 'case decision.'" The trial court did not address the constitutionality of HB 2316.

ANALYSIS

Appellants contend that the trial court erred in dismissing their petitions for appeal for lack of standing under the VAPA. Appellants argue that, because HB 2316 is unconstitutional special legislation, it cannot operate to remove entirely the normal administrative review process for COPN applications embodied in Code §§ 32.1-102.1 to 32.1-102.13.[14]

On appeal of an agency's determination on issues of law, the standard of review to be applied on appeal depends on the nature of the issue before the agency. "'If the issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i.e., the common law or constitutional law,'" the court need not defer to the

---

[14] Appellants raise various other arguments on appeal. However, the analysis of these issues requires a determination as to whether HB 2316 is unconstitutional special legislation. Because I would remand this case for a determination as to the constitutionality of HB 2316, I would not address any of these arguments on appeal.

- 22 -

agency's interpretation. Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 243-44, 369 S.E.2d 1,

8 (1988) (quoting Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-15 (3d Cir. 1981)).

> However, where the question involves an interpretation which is within the specialized competence of the agency and the agency has been entrusted with wide discretion by the General Assembly, the agency's decision is entitled to special weight in the courts[, and] . . . "judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion."

Id. at 244, 369 S.E.2d at 8 (quoting Va. Alcoholic Beverage Control Comm'n v. York St. Inn,

Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979)).

"'[W]hether a particular person has the right to contest administrative action is largely a

question of law, dependent on a number of variable factors, including the nature and extent of his

interest, the character of the administrative act and the terms of the statute.'" D'Alessio v.

Lukhard, 5 Va. App. 404, 407, 363 S.E.2d 715, 717 (1988) (quoting 73A C.J.S. Public

Administrative Bodies and Procedure § 189 (1983)). Thus, an appellate court should review the

trial court's decision that appellants lacked standing under the VAPA *de novo* on appeal.

> The stated purpose of the VAPA is "to supplement present and future basic laws conferring authority on agencies either to make regulations or decide cases as well as to standardize court review thereof save as laws hereafter enacted may otherwise expressly provide." Code § [2.2-4000]. The VAPA "does not supersede or repeal additional procedural requirements in such basic laws." Id. Also, the VAPA expressly exempts certain agencies and agency actions from its provisions. Code § [2.2-4002]. Thus, the VAPA is intended to be a default or catch-all source of administrative due process, applicable whenever the basic law fails to provide process. See State Bd. of Health v. Virginia Hosp. Ass'n, 1 Va. App. 5, 332 S.E.2d 793 (1985). In summary, the VAPA governs an agency's actions except where that agency's basic law provides its own due process or where the VAPA expressly exempts a particular agency or its actions.

School Bd. of York v. Nicely, 12 Va. App. 1051, 1058-59, 408 S.E.2d 545, 549 (1991). The

VAPA defines "basic laws" as the "provisions of the Constitution and statutes of the

- 23 -

Commonwealth of Virginia authorizing an agency to make regulations or decide cases or containing procedural requirements therefor." Code § 2.2-4001.

In resolving whether a party has standing to appeal an agency's action to the trial court, the trial court must determine whether the basic law contains a specific standing requirement, or whether the default standing requirement of the VAPA applies. Envtl. Def. Fund v. Va. State Water Control Bd., 12 Va. App. 456, 462, 404 S.E.2d 728, 732 (1991). Necessarily, the trial court must decide what basic law controls; in this case, the trial court had to decide whether HB 2316 supplanted the basic laws contained in Code §§ 32.1-102.1 to 32.1-102.13. However, such a determination requires first that the trial court evaluate whether HB 2316 is constitutional.

Indeed, every decision made by the Commissioner and by the trial court in this case was premised on the assumption that HB 2316 was constitutional. Appellants challenged, before both the Commissioner and the trial court, the constitutionality of HB 2316, alleging that it was special legislation; yet, both the Commissioner and the trial court refused to consider the constitutional arguments advanced by appellants on the grounds that HB 2316 removed their opportunity to contest any part of the proceedings on MFA's applications for COPNs.

Such reasoning is clearly incorrect; one cannot be divested of standing to challenge the constitutionality of legislation by the very legislation argued to be unconstitutional.[15] Further, standing to challenge the constitutionality and lawfulness of a statute or regulation is wholly separate from standing to challenge the merits of a decision. For example, the VAPA makes a distinction, in terms of standing to appeal, between one challenging the lawfulness of a

---

[15] In turn, the analysis in the majority opinion presupposes the constitutionality of HB 2316 without first determining whether the statute is constitutional. The majority contends that appellants have no remedy under VAPA, and must instead file a separate action for declaratory judgment or seek injunctive relief. Appellants raised the constitutionality of HB 2316 before the Commissioner, before the trial court, and before this Court throughout their appeal. By concluding that HB 2316 precludes any action under VAPA, the majority deems the statute constitutional without engaging in a review of the statute's constitutionality. It is this reasoning, also exhibited by the trial court, that prevents me from joining in the majority's analysis.

- 24 -

regulation and one challenging the lawfulness of a case decision. The VAPA provides, in pertinent part, that "*any person affected by* and claiming the unlawfulness of any regulation, or *party aggrieved by* and claiming unlawfulness of a case decision . . . shall have a right to direct review thereof by an appropriate and timely court action against the agency." Code § 2.2-4026 (emphasis added). While the VAPA addresses only the lawfulness of a regulation and not the lawfulness of legislation, the distinction does not alter my analysis.

Thus, the trial court's decision that appellants did not have standing to challenge the *merits* of the Commissioner's actions has no bearing on whether appellants had standing to challenge the constitutionality of HB 2316. Indeed, constitutional standing is defined as "whether the parties seeking to invoke the court's jurisdiction have 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" Cupp v. Bd. of Supervisors, 227 Va. 580, 589, 318 S.E.2d 407, 411 (1984) (quoting Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 72 (1978)).

While the constitutionality of legislation is a question of law that this Court normally reviews *de novo* on appeal, the consideration of whether legislation is unconstitutional special legislation requires factual findings that were not made below.[16]

---

[16] The majority opinion maintains that, in order to resolve the constitutionality of HB 2316, appellants had to seek either a declarative judgment or injunctive relief in the trial court *separately* from their administrative action under the VAPA.

I disagree. Appellants are entitled to receive complete relief administratively; they are not required to parse out their claims, pursuing some of their claims administratively and others simultaneously in the trial court. Our standard of review on appeal from agency decisions acknowledges that agencies do in fact decide issues of constitutionality.

> "If the issue falls outside the area generally entrusted to the
> agency, and is one in which the courts have special competence,
> i.e., the common law or *constitutional law*," the court need not
> defer to *the agency's interpretation*.

All statutes enacted by the General Assembly are presumed to be constitutional. Pulliam v. Coastal Emergency Servs., Inc., 257 Va. 1, 9, 509 S.E.2d 307, 311 (1999). A litigant who challenges the constitutional validity of a statute has the burden of proving that the challenged legislation is unconstitutional, and any reasonable doubt as to the statute's constitutionality must be resolved in favor of its validity. Id.

Article IV, § 14(18), of the Virginia Constitution provides that "the General Assembly shall not enact any local, special, or private law . . . [g]ranting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity." Article IV, § 15, continues by mandating that "the General Assembly shall enact general laws. . . . No private corporation, association, or individual shall be specially exempted from the operation of any general law, nor shall a general law's operation be suspended for the benefit of any private corporation, association, or individual."

These provisions, first adopted as part of the Constitution of 1902, were devised to "correct the perception that the General Assembly, in the nineteenth century, devoted an excessive amount of its time to the furtherance of private interests and to counter the 'sway that

---

Chippenham & Johnston-Willis Hosps., Inc. v. Peterson, 36 Va. App. 469, 475, 553 S.E.2d 133, 136 (2001) (quoting Kenley, 6 Va. App at 243-44, 369 S.E.2d at 8) (emphasis added).

> Hence, where the issues to be reviewed on appeal involve, for example, *the constitutionality of a statute*, . . . "less deference is required and the reviewing courts should not abdicate their judicial function and merely rubber-stamp *an agency determination*."

Volkswagen of Am., Inc. v. Quillian, 39 Va. App. 35, 50, 569 S.E.2d 744, 752 (2002) (quoting Kenley, 6 Va. App. at 243, 369 S.E.2d at 7-8) (emphasis added), rev'd in part on other grounds, 266 Va. 444, 587 S.E.2d 526 (2003). Thus, it is clear that agencies can properly consider the challenges to the constitutionality of statutes. I see no reason that the Commissioner could not have considered such a challenge in the instant case. See Volkswagen of Am., Inc. v. Smit, 266 Va. 444, 449, 454, 587 S.E.2d 526, 529, 532 (2003) (noting that, while the Court declined to rule on the constitutional issues because it decided the case on the merits, the Commissioner of the Department of Motor Vehicles had considered challenges to the constitutionality of a statute when the case was before the agency and that "the constitutional issues may arise again" on remand to the Commissioner).

moneyed interests were seen to hold over state legislatures at the turn of the century.'"

Benderson Dev. Co. v. Sciortino, 236 Va. 136, 147, 372 S.E.2d 751, 756 (1988) (quoting 1 A. E.

Dick Howard, Commentaries on the Constitution of Virginia 543 (1974)). "'Taken together, the

pervading philosophy of Article IV, sections 14 and 15 reflects an effort to avoid favoritism,

discrimination, and inequalities in the application of the laws.'" Id. at 147, 372 S.E.2d at 756-57

(quoting Howard, supra, at 549).

"The constitutional provisions prohibiting special legislation do not proscribe

classifications." Jefferson Green Unit Owners Ass'n v. Gwinn, 262 Va. 449, 459, 551 S.E.2d

339, 344 (2001). "However, to pass constitutional scrutiny, a classification 'must be natural and

reasonable, and appropriate to the occasion.'" Id. (quoting Martin's Ex'rs v. Commonwealth,

126 Va. 603, 612, 102 S.E. 77, 80 (1920)). "[T]he test for statutes challenged under the

special-laws prohibitions in the Virginia Constitution is that they must bear 'a reasonable and

substantial relation to the object sought to be accomplished by the legislation.'" Sciortino, 236

Va. at 147, 372 S.E.2d at 757 (quoting Mandell v. Haddon, 202 Va. 979, 991, 121 S.E.2d 516,

525 (1961)). "But the necessity for and the reasonableness of classification are primarily

questions for the legislature. If any state of facts can be reasonably conceived, that would sustain

it, that state of facts at the time the law was enacted must be assumed." Martin's Ex'rs, 126 Va.

at 612-13, 102 S.E. at 80. "The party assailing the enactment carries the burden of establishing

'that it does not rest upon a reasonable basis, and is essentially arbitrary.'" Gwinn, 262 Va. at

459 (quoting Holly Hill Farm Corp. v. Rowe, 241 Va. 425, 431, 404 S.E.2d 48, 50 (1991)).

> "The test of a special law is the appropriateness of its provisions to
> the objects that it excludes. It is not, therefore, what a law includes
> that makes it special, but what it excludes. If nothing be excluded
> that should be contained, the law is general. Within this distinction
> between a special and a general law, the question in every case is
> whether any appropriate subject is excluded to which the law, but
> for its limitations, would apply. If the only limitation contained in

> a law is a legislative classification of its objects, it is a general law."

Martin's Ex'rs, 126 Va. at 612, 102 S.E. at 80 (quoting Budd v. Hancock, 48 A. 1023, 1024 (N.J. Sup. Ct. 1901)).

"Laws may be made to apply to a class only, and that class may be in point of fact a small one, provided the classification itself be a reasonable and not an arbitrary one, and the law be made to apply to all of the persons belonging to the class without distinction." Ex parte Settle, 114 Va. 715, 718-19, 77 S.E. 496, 497 (1913). "There must be some such difference in the situation of the subjects of the different classes as to reasonably justify some variety of rule in respect thereto." Martin's Ex'rs, 126 Va. at 612, 102 S.E. at 80.

> "An act is not general when the class established by its provisions is at once so narrow and so arbitrary that duplication of its content is to be ranked as an unexpected freak of chance, a turn of the wheel of fortune defying probabilities."

Peery v. Va. Bd. of Funeral Dirs. & Embalmers, 203 Va. 161, 167, 123 S.E.2d 94, 98 (1961) (quoting In re Elm Street in New York, 158 N.E. 24, 26 (N.Y. 1927)).

Thus, in order to determine the constitutionality of HB 2316, this Court would have to decide whether the classification is reasonable and not arbitrary. To do so, the Court must consider: (1) the legislative history and purpose of the Act, see Sciortino, 236 Va. at 149, 372 S.E.2d at 757; (2) whether the classification in the Act promotes the Act's purpose, see Mandell, 202 Va. at 991, 121 S.E.2d at 525; Quesinberry v. Hull, 159 Va. 270, 275, 165 S.E. 382, 383 (1932); and (3) the factual determination of the inclusiveness or exclusiveness of the classification, see Quesinberry, 159 Va. at 273, 165 S.E. at 383 (considering number of counties in the class); Sciortino, 236 Va. at 149, 372 S.E.2d at 757 (considering number of workers exempt from the Sunday laws); County of Supervisors of Fairfax County v. Am. Trailer Co., 193

- 28 -

Va. 72, 78, 68 S.E.2d 115, 119 (1951) (considering number of counties included by classification).

These three factors are not exclusive, but are relevant to this particular analysis. Each case may warrant consideration of other factors depending on the particular facts of that case. "If any state of facts can be reasonably conceived, that would sustain it, that state of facts at the time the law was enacted must be assumed." Martin's Ex'rs, 126 Va. at 612-13, 102 S.E. at 80.

There is evidence in the record regarding the reasonableness of the classification in HB 2316; however, this evidence was not evaluated by either the Commissioner or the trial court.

In arguing that HB 2316 is unconstitutional special legislation, appellants point to several factors. First, in its report on the applications, DCOPN noted that the transfer of nursing home beds from one planning district to another is "exceedingly unusual" and that no similar request had been reviewed by the Department in at least seven years. Indeed, correspondence between counsel for MFA and staff at the Department of Health mentioned the "truly unique situation" the application poses and suggests that, in drafting procedures pursuant to HB 2316, the Department of Health must develop a "unique solution." Counsel for MFA consulted with staff at the Department of Health in May 2005 regarding the drafting of these procedures pursuant to HB 2316 and provided guidance to the Department in interpreting what the legislature intended in drafting the legislation. Counsel for MFA remarked that his "partner" was "intimately involved in this legislation as it was winding its way through the [General Assembly]."

Additionally, counsel for MFA, in correspondence to the Department of Health, notes that Warsaw HCC "began reducing the number of residents in Warsaw starting around September of 04 in order to achieve an occupancy of 120" by December 31, 2004. Counsel for MFA asserts that this is the reason that HB 2316 uses occupancy rates on a single date, December 31, as part of the classification criteria. CVHPA commented that

occupancy on a single day is generally not used to identify unused capacity, rather overall occupancy for the year is commonly used in health planning since the average daily census of any facility can vary throughout a year based upon seasonality, staffing availability, management decisions, and other factors that may or may not be related to public need.

DCOPN noted that, contrary to HB 2316, no prior legislation regarding COPN applications had ever "directed substantial alterations in the review procedures, time frames, and content of a COPN review as set forth in the basic COPN law."

DCOPN stated that

it is quite unlikely that any nursing home in Virginia, other than Warsaw HCC, could meet the very restrictive criteria of HB 2316. Other than a few nursing homes that opened in 2004, DCOPN can identify only two Virginia nursing homes, operated by multi-facility firms with locations in two or more planning districts, which had 2004 occupancy less than 67%. It seems unlikely that either of these two nursing homes would meet both the resident-origin requirement and the agency-staffing requirement set forth in HB 2316.

MFA, however, denies that they are the only facility that meets the criteria set forth in HB 2316. There is little evidence on this point developed in the record.

The issue of whether HB 2316 was special legislation was before the Commissioner, but he did not rule on it. The Commissioner found only that the criteria set forth in HB 2316 had been met, and issued the COPNs on this basis. On appeal to the trial court, appellants again raised the constitutionality of HB 2316, but the trial court failed to rule on that issue. Instead, the trial court found that appellants had no standing to challenge the issuance of the COPNs.

Here, there are factual disputes between appellants and MFA that must be resolved before the test for special legislation can be applied. Appellants argue that HB 2316 applies only to MFA, while MFA argues that the classification of HB 2316 is broad and potentially applies to many different nursing homes in Virginia.

Neither the Commissioner nor the trial court considered the purpose of HB 2316, whether the classification was reasonable, or whether the classification promotes the Act's purpose. There was no factual determination of the inclusiveness or exclusiveness of the classification. No determination was made as to whether Warsaw HCC was the only member of the classification.

Thus, this Court cannot determine whether HB 2316 is special legislation. To do so would require this Court to make factual findings not made by the Commissioner or by the trial court. Edwards v. Commonwealth, 49 Va. App. 727, 742, 644 S.E.2d 396, 403 (2007) (holding that, where the trial court denied a defendant's request "using an incorrect legal standard without making any of the predicate factual findings, one way or the other, required by the correct standard," the only appellate remedy was to vacate the defendant's convictions and "remand the case to the trial court with instructions to conduct a hearing on the matter").

CONCLUSION

Appellants raised a constitutional challenge to HB 2316 as special legislation that should have been considered by the trial court, as the trial court's standing analysis under the VAPA applied only to arguments reaching the merits of the Commissioner's decisions. Further, the Commissioner's decisions were predicated on the assumption that HB 2316 was constitutional, though no constitutional analysis was conducted by the Commissioner. I do not believe that we can indulge such assumptions without determining first whether HB 2316 is constitutional. I would reverse the decision of the trial court to dismiss appellants' petitions for appeal, and remand this case to the trial court with instructions to remand this case to the Commissioner to conduct a hearing to determine whether HB 2316 is unconstitutional special legislation. Therefore, I respectfully dissent from the majority's opinion.